MAURICE P. and VICTORIA CARLIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carlin v. Commissioner
Docket No. 4817-81.
United States Tax Court
T.C. Memo 1983-522; 1983 Tax Ct. Memo LEXIS 269; 46 T.C.M. (CCH) 1198; T.C.M. (RIA) 83522; August 24, 1983. John K. Ross, for the petitioners. H. Steven New, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes in the amounts of $9,248, $51,709, and $75,081 for the calendar years 1975, 1976 and 1977, respectively, and additions to tax under section 6653(a) [1] in the respective amounts of $462, $2,585 and $3,754, for these years. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following: (1) whether income reported by a trust established by petitioners is properly taxable to petitioners for the years here in issue, either as an anticipatory assignment of income or because petitioners should be treated as the owners of the entire *272 trust under sections 671 through 678; (2) whether petitioners are entitled to deduct all or any portion of the amount they paid in connection with the establishment of the trust under either section 162 or section 212 as an expense for the production or collection of income on for the management, conservation or maintenance of property held for the production of income, or in connection with the determination, collection or refund of any tax; and (3) whether respondent properly determined that a part of petitioners' underpayment of tax for each of the years here in issue was due to negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Santa Rosa, California, at the time the petition in this case was filed, filed joint Federal income tax returns for the calendar years 1975, 1976 and 1977 with the director, Fresno Service Center, Fresno, California. Maurice P. Carlin is a medical doctor engaged in the practice of medicine in Santa Rosa, California. On or about October 30, 1975, Victoria Carlin transferred to Dr. Carlin her interest in certain *273 jointly held property consisting of their personal residence and all personal property and household furnishings located therein. The transfer was made subject to and for the express purpose of facilitating the reconveyance of the property by Dr. Carlin to a trust. On or about October 30, 1975, Dr. Carlin, as grantor, and Mrs. Carlin, as trustee, signed a document entitled "Declaration of Trust of This Pure Trust." The document was further entitled "The Maurice P. Carlin Family Trust" (the Carlin Family Trust). On or about October 30, 1975, Dr. Carlin transferred to the Carlin Family Trust everything he owned, including stock in a medical building corporation, petitioners, personal residence and all personal property and household furnishings located therein. On November 1, 1975, Dr. Carlin, in his individual capacity, entered into an agreement with the Carlin Family Trust whereby he agreed to pay the trust 100 percent of the gross receipts from his medical practice for the trust's handling "all administration and business matters relating to 'Doctors' medical practice." On October 30, 1975, Mrs. Carlin transferred to the trust the exclusive use of her lifetime services, including *274 all remunerations earned by her. The trust provided that the trustees shall be not less than two in number but may be increased for practical reasons beneficial to the trust. The initial trustees were Mrs. Carlin and William T. Sullivan, a doctor friend of petitioners. It was understood that Dr. Sullivan would resign shortly after the creation of the trust. Under date of November 1, 1975, Dr. Sullivan did resign as a trustee. On October 30, 1975, Dr. Carlin had been elected as a trustee and on that date was elected as the executive trustee and Mrs. Carlin as the executive secretary of the trust. Thereafter, throughout the years here in issue, Dr. and Mrs. Carlin remained trustees of the trust. Under date of November 1, 1975, a letter was addressed by Dr. and Mrs. Carlin, as trustees of the trust, and Dr. Sullivan to Brian T. Carlin, a son of Dr. and Mrs. Carlin's who resided in Texas, requesting that he become a trustee in order that he might serve in case of the death of Dr. Carlin or the common death of Dr. and Mrs. Carlin. The letter stated that if Brian T. Carlin accepted the trusteeship, "please sign the enclosed letter to that effect and return it to the Trustees for *275 inclusion in the Trust's Records." Under date of November 3, 1975, there was signed by Brian T. Carlin a letter to the trustees of the Carlin Family Trust stating that he hereby accepted "the responsibilities, duties and obligations as described in the minutes of the fifth meeting dated Nov. 1, 1975 (A.M.), and pledge to discharge them to the best of my ability * * * always considering the intentions, hopes and desires of Maurice P. Carlin and Victoria L. Carlin as I understand them." The trust instrument provided that action could be taken upon a majority vote of the trustees. The trust further provided: The above named Trustees, for themselves and their successors IN TRUST, do hereby agree to accept properties real and personal to be conveyed and acknowledge acceptance of and delivery of all of the property specified, together with all the terms of The Trust herein set forth, agreeing to conserve and improve The Trust, to invest and reinvest the funds of Said Trust in such manner as will increase the financial rating of The Trust (Estate) during the period of outstanding liabilities of the various properties and enterprises in commerce for gain, exercising their best judgment *276 and discretion, in accordance with The Trust Minutes, making distributions of portions of the proceeds and income as in their discretion, and according to the minutes, should be made, making complete periodic reports of business transactions, and upon final liquidation distributing the assets to the beneficiaries as their interests may appear; and in all other respects administering Said Trust (Estate) in good faith strictly in conformity hereto. On October 30, Dr. Carlin received a certificate representing 100 units of beneficial interest in the trust, which constituted all the units of beneficial interest. On that same day, he transferred his certificate to the trust, and again on the same day, he and Mrs. Carlin each received a certificate representing 50 units of beneficial interest in the trust. On October 31, 1975, Dr. Carlin transferred his certificate to the trust, and certificates for 10 units were issued to each of three of his daughters. After the creation of the Carlin Family Trust, Dr. Carlin continued his medical practice in the same manner as he had theretofore practiced. Dr. and Mrs. Carlin, in their capacity as trustees, provided to themselves, and their five *277 children who were living at home, their former home as a residence and further provided for use by the Carlin family of all personal property and household furnishings located therein which had been conveyed to the trust. Likewise in their capacity as trustees, petitioners entered into an agreement whereby the trust, in consideration of their services, would pay for all transportation expenses, all travel expenses, all selling expenses, all office expenses, all dues, fees and subscriptions, all entertainment and/or convention and meeting expenses, adequate life insurance and insurance to cover costs of medical care, a reasonable monthly consulting fee, and living accommodations incident to the trust business. The decision as to what constituted trust business was to be made solely by Dr. and Mrs. Carlin, and on this basis they caused the trust to pay for all expenses relating to their living accommodations, medical expenses, automobile expenses and the support and education of their children. They also caused the trust to pay to them trustee fees in 1976 and 1977 in whatever amounts they determined. During 1975, petitioners paid to Estate Preservation Institute $10,000 for planning *278 the trust for them and preparation of the trust instrument, as well as information as to minutes to be kept by the trust and action to be taken at trustees' meetings.Included in the services to be rendered for the $10,000 fee was the preparation of petitioners' individual income tax returns, the income tax returns of certain of their children who were represented to be beneficiaries of the trust, and income tax returns of the trust for a 3-year period. Before the preparation of petitioners' 1975 return, the individuals responsible for collecting the $10,000 fee on behalf of Estate Preservation Institute left the organization, and the returns were actually prepared by individuals representing Estate Guardian Educational Trust in each of these years. According to the records of Estate Guardian Educational Trust, the cost of preparing petitioners' individual Federal income tax returns for the years for which Estate Preservation Institute had agreed to prepare them as part of the $10,000 fee, not including the cost of preparing the fiduciary returns or the children's returns, totaled $350. Dr. Carlin relied exclusively on representations of two individuals, Leo Russell and Belton *279 Hall, in deciding to enter into the trust agreement. Mr. Russell and Mr. Hall told Dr. Carlin that John Matonis and Barbara Hutchinson were working with them and that Mr. Matonis was their attorney. Dr. Carlin discussed the trust with Mr. Matonis and Ms. Hutchinson. At some point, Dr. Carlin consulted a lawyer in Oklahoma City by the name of Clyde Watts with respect to the trust. Mr. Watts told Dr. Carlin that he was handling an out-of-state case and had a desk full of material and did not have time to review the trust papers. Mr. Watts told Dr. Carlin that he knew John Matonis and Barbara Hutchinson. Mr. Watts did not tell Dr. Carlin that he reviewed the material and gave him to written opinion with respect to the trust. In September 1976, Dr. Carlin executed an addendum to the trust providing for transfers of beneficial interests only to himself and Mrs. Carlin and their children and grandchildren. He executed this addendum at the suggestion of someone from Estate Guardian Educational Trust and did not understand in full what the addendum was intended to accomplish. He did think that it was intended to keep the beneficial interests in the trust in the Carlin family. *280 When an Internal Revenue Service agent commenced an investigation of petitioners' tax returns for the years here in issue, petitioners did not produce the books and records requested by the agent. Mrs. Carlin suggested to the agent that he get in touch with someone at Estate Guardian Educational Trust. On their joint Federal income tax return for the calendar year 1975, petitioners included as income amounts received from Dr. Carlin's medical practice as shown on a Schedule C and other sources prior to November 1, 1975. For November and December, Dr. and Mrs. Carlin reported no income from these sources, but on a U.S. Fiduciary Income Tax Return, Form 1041, for the fiscal year November 1, 1975, through October 31, 1976, these items of income were reported by the trust. On their 1976 return, petitioners reported on Schedule C gross receipts of $162,008 from Dr. Carlin's medical practice and deducted therefrom the amount of $155,008 described as "office management." The amount deducted by petitioners as "office management" was included by the trust in its gross income for its fiscal years ended October 30, 1976 and 1977. The trust, on its fiduciary return, Form 1041, deducted *281 from the $155,008 the actual costs of operating Dr. Carlin's medical practice. Items of dividend and interest income for 1976 from assets transferred to the trust by Dr. Carlin were reported by the trust and not by Dr. and Mrs. Carlin. On their Federal income tax return for the calendar year 1977, Dr. Carlin's income reported on Schedule C showed gross receipts of $178,707 from which was deducted $180,124 as "office management," resulting in a net loss of $1,417 which was reported as a loss on petitioners' tax return. The only income reported on petitioners' 1977 tax return was denominated as "trustee fees." The $180,124 was reported by the Carlin Family Trust on its fiduciary income tax returns for its fiscal years ended October 31, 1977, and October 31, 1978, and the cost of conducting Dr. Carlin's medical practice was subtracted therefrom on the fiduciary returns. The trust also reported items of dividend and interest income from property transferred to it by Dr. Carlin and deducted amounts of trustees' fees. On their 1975 return, petitioners deducted $10,000 as a miscellaneous deduction, explained as "Cost to Maintain & Conserve Assets &/or minimize tax per IRC Section 212 *282 ." Respondent in his notice of deficiency increased petitioners' income as reported for the year 1975 by $8,385 of net income from Dr. Carlin's medical practice, stating that this amount was included in his gross income under section 61 and sections 671-678. For the years 1976 and 1977, respondent increased Dr. and Mrs. Carlin's reported income by $2,003 and $5,391, respectively. These amounts were composed of interest, dividend, and rental income which respondent explained were improperly excluded from petitioners' gross income. Respondent, for the years 1976 and 1977 increased petitioners' income as reported from Dr. Carlin's medical practice by $111,984 and $137,100 respectively, by disallowing this portion of the amount claimed on petitioners' returns as "office management" fees paid to the Carlin Family Trust, with the explanation that if, in fact, the amounts were properly reductible, they constituted income to petitioners under the provisions of sections 671 through 678.
For the year 1975, respondent disallowed in full the claimed $10,000 deduction as "Cost to Maintain & Conserve Assets &/or minimize tax per IRC Section 212." Respondent decreased petitioners' *283 reported income for the calendar year 1976 by $16,000, which had been reported by petitioners on their return as income from the Carlin Family Trust with the explanation that the amount was a return of corpus. [2]
*284 OPINION Respondent takes the position that the Carlin Family Trust was a sham and should be considered to be of no economic reality so that the income purportedly received by the trust should be taxable to petitioners. Respondent further takes the position that the major portion of the income reported by the Carlin Family Trust was actually Dr. Carlin's income from his medical practice which he purported to assign to the trust and that the other income reported by the trust is taxable to petitioners under the provisions of sections 671 through 678. In our view, clearly Dr. Carlin's attempted assignment to the trust of his income from his practice of medicine is not effective to shift the incidence of taxation. The fact that income tax cannot be escaped by a taxpayer to an anticipatory arrangement assigning his income to another was determined by the Supreme Court many years ago. Lucas v. Earl,281 U.S. 111 (1930). We, and other courts, have held in a number of cases in which the taxpayers had created trusts comparable to the one here involved that the attempted assignment of income to this type of trust does not relieve the assignor of tax with respect to *285 the income. See Vnuk v. Commissioner,621 F.2d 1318 (8th Cir. 1980), affg. a Memorandum Opinion of this Court; Markosian v. Commissioner,73 T.C. 1235 (1980); Wessenberg v. Commissioner,69 T.C. 1005 (1978). [3] We have set forth the facts here in some detail and these facts show that the arrangement between Dr. Carlin and the trust was nothing more than an attempt by Dr. Carlin to assign his income to the trust. The argument made by petitioners, that the trust furnished management for Dr. Carlin's medical practice in return for the total income he received from his practice, is without merit. In fact, Dr. Carlin continued as the executive trustee of the trust to manage his own medical practice in the same way he had managed it before he formed the trust. He received nothing in return for his assignment of his income. No arm's-length arrangment would be made by any individual to assign his entire income to another in return for the management of his business. Dr. Carlin continued to manage the affairs of his medical practice as an executive trustee of the trust as he did before his income was assigned to the trust. There is no *286 economic reality to an assignment of the entire income of an individual to a trust in return for the trust's purportedly managing the business. See Markosian v. Commissioner,supra.We therefore conclude that Dr. Carlin's income from his medical practice is taxable to him and he is entitled to the deductions necessary to produce that income. We also conclude, on the basis of the facts here present, that all income reported by the trust is taxable to petitioners as the grantors of the trust. Section 677(a) provides as follows: (a) General Rule.--The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a *287 nonadverse party, or both, may be-- (1) distributed to the grantor or the grantor's spouse; Petitioners were the trustees of the Carlin Family Trust. Dr. Carlin was the executive trustee and Mrs. Carlin was the executive secretary of the trust. Although their son Brian agreed to become a trustee in the event of the death of Dr. Carlin or the death of both Dr. and Mrs. Carlin, there is nothing in the record to show that he was ever a trustee. However, even if he had become a trustee, Dr. and Mrs. Carlin, as two of the three trustees, could have controlled distribution of the income of the trust. Clearly, Dr. and Mrs. Carlin were the grantors of the trust, since Mrs. Carlin conveyed her interest in the property which she and Dr. Carlin jointly owned to Dr. Carlin with the understanding that it would be conveyed by him to the Carlin Family Trust. This causes both Dr. and Mrs. Carlin to be grantors. See Vnuk v. Commissioner,supra at 1321. Also, Mrs. Carlin is Dr. Carlin's spouse. The trust provisions and other facts in this case are quite similar to those in Vercio v. Commissioner,73 T.C. 1246 (1980). In that case, under facts that *288 are not distinguishable from those in the instant case, we held that the trust income was taxable to the husband and wife, grantors of the trust, within the meaning of section 677. In that case we concluded that the husband and wife taxpayers could distribute the trust income to themselves without consent or approval of an adverse party. On the basis of our reasoning in the Vercio case, at pages 1255-1259, we conclude that petitioners are taxable on the entire income of the Carlin Family Trust. We conclude that petitioners have failed to show that any part of the $10,000 which they paid to Estate Preservation Institute is deductible except the amount paid for the preparation of petitioners' personal tax returns. Amounts paid for advice with respect to rearrangement of property or setting up of a trust are generally nondeductible personal expenditures within the meaning of section 262. Epp v. Commissioner,78 T.C. 801, 805 (1982); Luman v. Commissioner,79 T.C. 846, 857-858 (1982). Neither petitioner in this case was able to clearly state for what the $10,000 payment was made. They testified generally as to receiving advice from a Mr. Hall *289 and a Mr. Russell. However, insofar as their testimony showed, this advice was with respect to the rearrangement of their property for family reasons. However, there is evidence in the record to show that approximately $350 of the $10,000 payment was paid for preparation of petitioners' personal Federal income tax returns. Any expenditure made for the preparation of the tax returns of the family trust or petitioners' children would not be a properly deductible expense of petitioners. Section 212(3) permits the deduction of amounts paid "in connection with the determination, collection, or refund of any tax." On the facts presented in this case, we conclude that $350 of the $10,000 paid by petitioners was paid for the preparation of petitioners' personal tax returns and is deductible under the provisions of section 212(3). We hold, however, that no other part of the $10,000 payment has been shown to be deductible by petitioners. Petitioners argue that they should not be liable for payment of the additions to tax for negligence or disregard of rules and regulations under the provisions of section 6653(a).They contend that they acted reasonably and on the advice of responsible *290 people in forming the trust and assigning their property and income to it. The record shows that petitioners relied on the advice of representatives of Estate Preservation Institute in deciding to form the trust and assign their income and property to it. After they talked to Mr. Hall and Mr. Russell about entering into the trust, petitioner Dr. Carlin talked to a Mr. Matonis and a Ms. Hutchinson who he was told were working for Mr. Russell and Mr. Hall. Dr. Carlin was told that Mr. Matonis was the attorney for Messrs. Russell and Hall. Dr. Carlin did send some materials to an attorney in Oklahoma City, Mr. Clyde Watts, for review, but this attorney did not review the materials and Dr. Carlin entered into the trust without getting any advice from an attorney or an accountant independent of the individuals who first "sold" him the materials to form the trust. The type of advice which petitioner received is not the type which would be relied on by a reasonable person of Dr. Carlin's education in making a business decision. Considering the facts of this record as a whole, we conclude that petitioners have failed to show that some part of their underpayment of tax was not due to *291 negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). See Wessenberg v. Commissioner,supra at 1015. We therefore conclude on the basis of this record that petitioners are liable for the addition to tax under section 6653(a) for each of the years here in issue. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. At the trial, issues were raised with respect to the correctness of the amounts of deductible expenses incurred in Dr. Carlin's medical practice. The parties disposed of this issue by agreement except with respect to the amounts of refunds made by Dr. Carlin to patients when payments were received from the patients' insurer after the patients paid the bill. The record was left open to permit the parties to later stipulate these amounts. Without objection by respondent, records were received in evidence showing that Dr. Carlin made patient refunds of $1,016.51, $110, and $539 in the calendar years 1975, 1976, and 1977, respectively. Although respondent does not specifically so state in his reply brief, we conclude from his agreement to the documents received in evidence that he does not object to or question the accuracy of these figures. At the hearing, counsel for respondent stipulated with counsel for petitioners that upon verification of the amounts he agreed that, in addition to the other deductions allowed, deductions for these amounts should be allowed in computing Dr. Carlin's income, should the Court hold the receipts from Dr. Carlin's medical practice to be taxable to petitioners.↩
3. Numerous memorandum opinions of this Court have held to the same effect. In Markosian v. Commissioner,73 T.C. 1235↩ (1980), we held a trust comparable to the one here involved "devoid of economic reality" for income tax purposes where the taxpayer had a "management fee" arrangement with a trust comparable to Dr. Carlin's arrangement in this case.