DENNY L. JOHNSON and MARY JANE JOHNSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DENNY L. JOHNSON FARMS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Johnson v. Commissioner
Docket Nos. 7592-83, 7593-83.
United States Tax Court
T.C. Memo 1985-175; 1985 Tax Ct. Memo LEXIS 457; 49 T.C.M. (CCH) 1203; T.C.M. (RIA) 85175; April 8, 1985. Patrick B. Mathis and John J. Vassen, for the petitioners. Frank Agostino, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax as *458 follows: Taxpayer
Taxable Year
Deficiency
Denny L. Johnson and
Mary Jane Johnson
1979
$737.00
Denny L. Johnson and
Mary Jane Johnson
1980
826.00
Denny L. Johnson
Year ending
Farms, Inc.
February 29, 1980
330.91
Denny L. Johnson
Year ending
Farms, Inc.
February 28, 1981
406.37
After concessions, the issues for decision are: (1) whether the individual petitioners, Denny L. Johnson and Mary Jane Johnson, may exclude from gross income under section 119[1] dividend income equal to the fair market value of the residence they occupied which was owned by the petitioner employer-corporation for the taxable years 1979 and 1980; and (2) whether petitioner Denny L. Johnson Farms, Inc., was entitled to deduct depreciation on the residence provided to the individual petitioners, for the taxable years ending February 29, 1980, and February 28, 1981, under the provisions of section 167. FINDINGS OF FACT Some of the facts have been *459 stipulated. The stipulations of facts and accompanying exhibits are so found and incorporated herein by reference. Denny L. Johnson and Mary Jane Johnson, husband and wife (also hereinafter referred to as petitioners or Mr. Johnson and Mrs. Johnson), were residents of Arcola, Illinois, during the taxable years 1979 and 1980, and at the time the petition in this case was filed. Petitioners have resided on what is presently the Denny L. Johnson Farms, Inc., farmstead since 1961. In 1976, petitioners incorporated their family-owned farm into Denny L. Johnson Farms, Inc. (also hereinafter referred to as the corporation), which is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in Arcola, Illinois. Mr. and Mrs. Johnson own 900 and 100 shares of the corporation, respectively, representing all of the outstanding shares of Denny L. Johnson Farms, Inc. Petitioners timely filed their joint Federal income tax returns for the taxable years 1979 and 1980 with the Internal Revenue Service Center in Kansas City, Missouri. The corporation timely filed Federal income tax returns for the taxable years ending February 29, 1980, and February 28, 1981, at *460 the same location. During the periods at issue, the corporation owned 200 acres of land, custom farmed 80 acres, and rented 40 acres of farmland. The corporation also leased 703 acres of farmland under "share-crop" arrangements. By oral and written agreements between the landlords and the corporation, the gross proceeds of crops sold from the farmland and the cost of seed and fertilizer were shared on an equal basis. The landlords paid the property taxes related to the property. The landlords of the various properties were: Landlord
Relationship to Petitioners
Mary Adamson
None
First National Bank
Mr. Johnson owns one-third
of Mattoon
beneficial interest in
Illinois land trust
James Nolan, Est.
None
Helen B. Gaylord
None
Paul Combs
None
William Combs
None
Mrs. Wilburn Johnson
Mr. Johnson's mother
Robert and Thomas Harlan
None
Donald Buckalew
Mr. Johnson's
brother-in-law
During the entire period at issue, the corporation was engaged in the farming of grain, which is a business with a low profit margin that requires efficient operation. The corporation produced the following crops: Taxable Year
Grain
Bushels
Year ending February 29, 1980
Corn
48,990
Year ending February 29, 1980
Soybeans
16,532
Year ending February 28, 1981
Corn
40,700
Year ending February 28, 1981
Soybeans
16,926
*461 During the taxable years ending February 29, 1980, and February 28, 1981, the corporation sold grain for $219,734 and $255,320, respectively. The corporation stored soybeans and corn in bins upon the corporate property in the following amounts: Bushels
Quarter
Ending
Soybeans
Corn
Total
03-01-79
10,204
11,908
22,112
06-01-79
7,728
7,728
09-01-79
5,075
5,075
12-01-80
8,425
17,746
26,171
03-01-80
17,060
17,060
06-01-80
11,061
11,061
09-01-80
6,201
6,201
12-01-80
7,956
7,956
03-01-80
7,956
7,956
The approximate value of the stored grain was $89,597 and $100,600 for the taxable years ending February 29, 1980, and February 28, 1981, respectively. At all times relevant hereto, commercial grain elevators operated in the area in which grain was stored for a fee. During the taxable years ended February 29, 1980, and February 28, 1981, the corporation owned equipment used in the farming operation with approximate fair market values of $6,150 and $7,776, respectively. During the same taxable years, the corporation leased farm equipment from Mr. Johnson with approximate fair market values of $194,100 and $206,800, *462 respectively. Under a provision of the farm equipment lease, the corporation was responsible for maintenance and repair of the leased equipment, damages to such equipment, and risk of loss, and was obligated to keep such equipment insured. All of the equipment was insured and stored on the corporation's farmstead. The corporation's grain business entailed the planting, cultivation, harvesting, drying, storage, and sale of corn and soybeans. The grain operation begins with planning for the planting of the year's crops; purchasing of seed corn, soybeans, herbicides, and fertilizer; and the maintenance of equipment in preparation for the planting season. Corn and soybeans are planted during the spring of the year. In planting, soil and weather conditions are carefully monitored in order to plant the crops as close as possible to the optimum planting period. Peanting is not carried out on a continual, day-to-day basis because of delays caused by inclement weather. During the planting season, there are days in which only a few hours are available for planting. Under ideal conditions, the acreage owned, rented, or leased by the corporation could be planted in a total of 100 hours, *463 or the equivalent of ten 10-hour days, but such conditions seldom occur. During the growing season, the crops are monitored for insects and weed infestation, with cultivation of the crops, spraying for weeds, and insect control continuing throughout this period. Fluctuating contitions affect cultivation in a fashion similar to the manner in which they affect planting, i.e., cultivation may not be possible for more than a few hours on any one particular day. Under ideal conditions, cultivation of the land worked by the corporation's employees could be accomplished in ten to fifteen 10-hour days. Cultivation, however, follows the inspections and monitoring, and is, therefore, done throughout the growing season. Harvesting of crops begins in September and ordinarily runs through November, although it may extend for a longer period. After grain is harvested, it is dried in grain storage bins. The drying process involves the drying of grain with electric motors pushing air, supplemented with gas or electric heat, through the corn. The temperature is monitored by a thermostat similar to that found in a home heating system. In the event that th electricity fails, the drying motors *464 in the drying bins do not restart automatically, but must be restarted manually. If the motors stop, the drying process is delayed, but not stopped. During the drying process, the grain bins are monitored several times each day to see whether the optimal moisture content has been attained. If the moisture content is too high, the crops will rot in storage; if too low, the corporation will incur unnecessary drying expense and shrinkage, with consequent reduced sale proceeds. During the drying season, Mr. Johnson checked the drying bins several times each day for continued operation and moisture content. Once the grain is dried, it is stored in a grain elevator or storage bin until sale; in this case, such storage was primarily in the corporation's storage bins. The corporation employed seven people during the taxable year 1979, seven people in the taxable year 1980, and nine people in the taxable year 1981. The corporation, which was owned solely by petitioners, employed Mr. Johnson under an employment contract dated January 2, 1976, as amended on March 1, 1977, March 1, 1978, January 1, 1979, January 1, 1980, and March 1, 1981. Mr. Johnson's responsibilities included making *465 decisions as to the management and operation of the farm and devotion of his "full time, energy, skills and effort to the furtherance of the business of the company." Under the terms of the employment contract, the corporation provided living accommodations to Mr. Johnson and his family, and paid all of the expenses of such accommodations. Mr. Johnson was required by the contract to occupy the accommodations provided. The reasons provided in the contract for requiring Mr. Johnson to live on the premises were so that Mr. Johnson could manage the general operations of the farm; secure equipment owned and leased by the corporation; supervise the drying and storing of grain; and perform all of these duties on a 24-hour-per-day basis. At all times relevant to this case, petitioners and three of their children lived on the corporation's land in a residence furnished to them by the corporation. The residence was built in 1961 at a cost of $32,586 and contains 2,256 square feet of living space. The fair rental value of the residence provided by the corporation to petitioners during the taxable years at issue was $250 per month. The corporation's land is located 3 miles from Humboldt, *466 Illinois, 8 miles from Mattoon, Illinois, 8 miles from Charleston, Illinois, and 4-1/2 miles from Arcola, Illinois. At all times relevant hereto, there were residences comparable to the one in which petitioners resided available for rental in Charleston and Mattoon. In Coles County, Illinois, where the corporation's farmstead, rented land, and share-cropped land are located, farmers generally reside on the farm when valuable farm equipment and a grain-drying operation are on the premises. The presence of a manager-operator on the property for 24 hours a day provides security for the equipment; insures continued operation of the grain dryers; and allows for a more efficient operation. On January 4, 1983, the Commissioner timely issued statutory notices of deficiency to petitioners and the corporation, in the amounts and for the taxable years listed above. The Commissioner determined that petitioners received dividends from the corporation equal to the fair rental value of the residence they occupied. In addition, he determined that petitioners were not entitled to exclude such dividends in excess of the dividends received exclusion under the provisions of section 119.The Commissioner *467 disallowed the deductions for depreciation of the residence claimed by the corporation on its income tax returns. ULTIMATE FINDINGS OF FACT Petitioner Denny L. Johnson was required to be available for duty at all times in connection with his responsibilities as operator-manager of the corporation's farm operation. It was both necessary, and a condition of his employment, that petitioner Denny L. Johnson reside upon the farm premises in order to properly perform the duties of his employment. Petitioners resided on the farm for the convenience of the employer-corporation. OPINION After concessions, [2] the issues for decision are: (1) whether the individual petitioners may exclude from gross income under section 119 dividend income equal to the fair market value of the residence they occupied which was owned by the petitioner employer-corporation; and (2) whether petitioner corporation was entitled to deduct depreciation on the residence provided to the individual petitioners, under the provisions of section 167. *468 The Commissioner's determination in his statutory notice of deficiency is presumptively correct, and petitioners have the burden of disproving each individual adjustment. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). During the taxable years at issue, the corporation provided lodging to petitioners without charge. The fair market value of such lodging constituted dividend income to petitioners and must be included in their gross income under section 301, unless specifically excluded. Under section 119, the value of lodging furnished to an employee, his spouse, or any of his dependents by or on behalf of his employer for the convenience of the employer is excluded from gross income, but only if the employee is required to accept the lodging on his employer's business premises as a condition of his employment. Sec. 1.119-1(b), Income Tax Regs., amplifies *469 the requirements for exclusion: The value of lodging furnished to an employee by the employer shall be excluded from the employee's gross income if three tests are met: (1) The lodging is furnished on the business premises of the employer, (2) The lodging is furnished for the convenience of the employer, and (3) The employee is required to accept such lodging as a condition of his employment. The requirement of subparagraph (3) of this paragraph that the employee is required to accept such lodging as a condition of his employment means that he be required to accept the lodging in order to enable him properly to perform the duties of his employment. Lodging will be regarded as furnished to enable the employee properly to perform the duties of his employment when, for example, the lodging is furnished because the employee is required to be available for duty at all times or because the employee could not perform the services required of him unless he is furnished such lodging. If the tests described in subparagraphs (1), (2), and (3) of this paragraph are met, the exclusion shall apply irrespective of whether a charge is made, or whether, under an employment contract or statute *470 fixing the terms of employment, such lodging is furnished as compensation. * * * The parties agree that the first condition, that the lodging be on the employer's premises, and the second condition, that the provisions of such lodging be for the convenience of the employer, are met. The parties disagree, however, on whether the third condition is met. Petitioners assert that Mr. Johnson must be available for duty at all times, both to perform his duties under his employment contract, and to obtain the optimum financial return. Respondent contends that it is unnecessary for Mr. Johnson and his family to live on the corporation's land on the basis that: (1) many farmers do not live on the property that they farm; (2) few, if any, duties require the presence of a manager for 24 hours a day; and (3) Mr. Johnson's duties could be performed just as easily if he commuted from a residence in one of the nearby communities. Respondent also argues that the corporation is not an independent entity due to its ownership by petitioners. Corporations are separate and distinct from their shareholders, *471 Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943), and there is no evidence in the record before us which would require or allow us to disregard the separate nature of the taxpayers before us. The corporation lacks neither economic reality nor substance, and there is thus no parallel to the family trust cases exemplified by Markosian v. Commissioner,73 T.C. 1235 (1980). Respondent attempted, on brief, to contend that an alternate ground for disallowing the exclusion under section 119 was that the arrangement described above was, in some fashion, an attempt at tax avoidance under section 269. No determination of tax avoidance purpose under section 269 was contained in the notices of deficiency, nor were such allegations contained in answers to the petitions. Further, to address this issue at this late date would be to allow respondent, in effect, to change his position subsequent to trial without affording petitioners the opportunity to refute this contention. We will not, therefore, consider this ground. Seligman v. Commissioner, 84 T.C.     (Feb. 12, 1985). The issue before us is, therefore, whether petitioners were required *472 to accept lodging furnished to them as a "condition of * * * employment." The proper inquiry is not whether the employee was contractually required to reside on the employer's premises, or whether housing was available nearby, but whether the lodging was furnished to petitioners because the nature of Mr. Johnson's job required that he "be available for duty at all times." Sec. 1.119-1(b), Income Tax Regs. The question is primarily one of fact to be resolved by a consideration of all of the circumstances before us. Three experts testified [3] on the issue of whether a resident manager was indispensable to the operation of the corporation's farm. Louis Christen, an agricultural extension advisor for Coles County for 26-1/2 years, is thoroughly and personally familiar with the particular farm at issue. Coles County is the location of all of the property farmed by the corporation. His opinion was that the constant presence of a manager was both "highly desirable" and "highly necessary" in order to make the maximum profit, particuarly in the last several years when good management has made the difference between a small profit and no profit at all. Mr. Christen *473 lives on a farm where he conducts drying operations and stores equipment, and has a tenant farmer who does not live on the property. Mr. Christen stated that if he moved to town, a tenant would be required to live on the farm. Royce Marble is senior vice-president and trust officer at the Charleston National Bank responsible for the management of approximately 15,000 acres of farm land, most of which is leased on a "share-crop" basis. If a farm has a residence and improvements such as grain bins and machine sheds, the bank routinely requires that the tenant live upon the property. A "courtesy rent" of between $100 and $300 a year is normally charged. He also testified that having a resident farmer improves the bottom line. The bank does not build a residence upon a vacant property if there are no improvements upon it. Respondent's expert witness, Elmer E. *474 Rankin, has been an agricultural extension advisor for Sangamon County, Illinois, since November of 1980, and testified pursuant to a subpoena served upon him by respondent. He testified that, in general, most land owners do not live on their farms, and that the majority do not require their tenants to live on the farms. Upon cross examination, however, he conceded that he knew of no nonresident farmers who had either grain drying operations or large amounts of equipment and supplies stored on the premises. He also conceded that the presence of a resident manager would make the farm operate more efficiently. This evidence is sufficient to sustain petitioners' burden of proof, thus distinguishing this case from Caratan v. Commissioner,52 T.C. 960 (1969), revd, 442 F.2d 606 (9th Cir. 1971). We find as a fact that petitioners were required to reside on the corporation's farmstead in order to properly manage and operate the farm, and that occupying the residence upon the farmstead was a condition of Mr. Johnson's employment. A farming operation of the complexity set forth above is not a 9-to-5 business; it requires that a manager be available to *475 make the necessary decisions, solve the necessary problems, and direct the necessary labor. In this case, the grain-drying operation required constant, if not continuous, monitoring and work. Further, while insurance does, of course, reduce the out-of-pocket cost of replacing expensive equipment, the presence of a manager-operator makes less likely the need to replace stolen or vandalized equipment. [4]
We also find, as a corollary and as a result of the above finding, that the habitation upon the farmstead is used in the corporation's business as a residence for its on-site manager-operator. The corporation is, therefore, entitled to the depreciation deduction disallowed by the Commissioner. Sec. 167. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, and attendant regulations as amended and in effect for the relevant years, and all rule references are to this Court's Rules of Practice and Procedure.↩
2. The corporation's claim in its petition to a $300 "rent expense" disallowed by the Commissioner was not argued on brief, nor was any evidence presented on the matter at trial. The corporation is deemed to have conceded this issue.↩
3. This case is a companion to J. Grant Farms, Inc., et al. v. Commissioner,T.C. Memo. 1985-174↩, in that the testimony of the non-petitioner witnesses in this case was incorporated into the record of the companion case. The two cases were not otherwise consolidated for trial, briefing, or opinion.
4. McDowell v. Commissioner,T.C. Memo. 1974-72↩.