ALVA W. METCALF, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Metcalf v. Commissioner
Docket No. 12829-83.
United States Tax Court
T.C. Memo 1985-487; 1985 Tax Ct. Memo LEXIS 144; 50 T.C.M. (CCH) 1077; T.C.M. (RIA) 85487; September 18, 1985. Alva W. Metcalf, pro se. C. Ellen Pilsecker, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following deficiencies in income tax and additions to tax for the years 1978 through 1980: Additions to Tax, I.R.C. 1954
Year
Increase in Tax
Sec.6651(a)(1)
Sec.6653(a)
1978
$17,034
$3,820
$859
1979
19,119
956
1980
8,194
409
After concessions, the principal issue remaining for decision is whether petitioner effectively avoided Federal income tax *146 through the use of a "family trust". Also in issue are the Commissioner's determination of additions to tax under sections 6651(a)(1) and 6653(a). FINDINGS OF FACT Some of the facts have been set forth in two stipulations of facts; one of them, a supplemental stipulation, was filed after trial. The two stipulations and attached exhibits are incorporated herein by reference. Petitioner was a resident of Hollis, New Hampshire, at the time he filed his petition herein. During the years in issue, petitioner lived in Anchorage, Alaska. Beginning in early 1977 and during the tax years he worked for the Atlantic Richfield Company as a data systems engineer. During at least 1978, he was also involved in a "Placer Mining" business. Sometime during 1977, petitioner attended a meeting in Anchorage conducted by "Estate Guardian Education Trust" (EGET), a San Diego, California, based company which was then promoting the use of "family trusts" as devices for lessening or avoiding taxes. He decided to adopt the program sponsored by EGET, and paid it a fee of about $4,000 to establish a family trust for him. Included in EGET's services was the furnishing primarily of a trust instrument *147 and other related documentary materials. On June 22, 1977, petitioner signed the trust instrument, pursuant to which, he purported to create, as grantor, the "North Star Trust" (North Star or trust). It provided, in part, as follows: The aforenamed Trustees, for themselves and their successors IN TRUST, do hereby agree to accept certain properties to be conveyed and acknowledge acceptance of and delivery of all of said property, together with all the terms of the Trust herein set forth, agreeing to conserve and improve the Trust, to invest and reinvest the funds of Said Trust in such a manner as will increase the financial rating of the Trust Estate during the period of outstanding liabilities of the various properties and enterprises in commerce for gain, exercising their best judgment and discretion, in accordance with the Trust Minutes, making distributions of portions of the proceeds and income as is their discretion, and according to the minutes, should be made, making complete periodic reports of business transactions, and upon final liquidation distributing the assets to the beneficiaries as their interests may appear; and in all other respects administering Said Trust *148 Estate in good faith strictly in conformity hereto. * * * TRUSTEES' MEETINGS
By a regular act of the Trustees, they may provide for meetings at stated intervals without notice, and special meetings may be called at any time by two (2) or more Trustees upon three days' written notice, which may be waived. At any regular or special meeting a majority of the Trustees shall constitute a quorum for conducting business, PROVIDED, affirmative action may only be had upon a majority vote of the Trustees, whether present or absent, except that at special meetings called for a special purpose, the majority present may affirmatively act in emergency matters. POWERS OF TRUSTEES
Trustees may do anything any individual may legally do in any city, borough, county, parish, state, province, nation, or country, subject to the restrictions herein noted. The Trustees shall continue in business, conserve the property, commercialize the resources, and extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of This Trust, * * *. A Minute of Resolutions of the Board of Trustees authorizing what it is they determine *149 to do or have done shall be evidence that such an act is within their power. * * * TRUST ADMINISTRATION
The Trustees shall regard this instrument as their sufficient guide, supplemented from time to time by their resolutions, said resolutions to be ratified always by a majority of the Trustees then in office and participating in the issuing meeting, covering contingencies as they arise and are recorded in the minutes of their meetings, which are the by-laws, rules, and regulations of This Trust. OFFICERS AND MANAGEMENT
The Trustees may in their discretion elect from among their number a President, Secretary, and Treasurer, or any other officers they may deem expedient for proper functioning. * * * EXPENDITURES
The Trustees shall fix and pay compensation of all officers, employees, or agents in their discretion, and may pay themselves such reasonable compensation for their services as may be determined by a majority of the Board of Trustees. * * * TRUSTEES' DECLARATION OF PURPOSE OF THIS TRUST
The Declared Purpose of the Trustees of This Trust shall be to accept rights, title, and interest in and to certain properties, whether tangible or intangible, *150 conveyed by the Creator hereof and Grantor hereto to be the corpus of This Trust, so that he can maximize his lifetime efforts through the utilization of his Constitutional Rights; for the protection of his family in the pursuit of his happiness through his desire to promote the general welfare; all of which Alva W. Metcalf feels he will achieve because they are sustained by his Religious and/or Philosophical Beliefs. The Trustees by their resolution of purpose may perform and function for any purpose on behalf of any individual, group, or combination of individuals, severally or collectively. In such instances, the powers and authority of the Trustees shall be defined and limited to the general purposes set forth by the Declaration of Trust and the Trustees' Declaration of Purpose. * * * * * * [T]heTrustees, as trustees, insofar as they are trustees, or the officers, agents, or employees of This Trust, as officers, agents, or employees of This Trust, shall not have or possess, in their respective capacities, any beneficial interest in the property or assets of This Trust. HOLDERS OF CERTIFICATES OF BENEFICIAL INTEREST
A holder of a Certificate of Beneficial Interest *151 is a beneficiary of This Trust, and has a beneficial interest, and not a legal interest, in the property or assets of This Trust. * * * CERTIFICATES OF BENEFICIAL INTEREST The Beneficial Interest, as a convenience for distribution, is divided into One Hundred (100) Units, substantially in certificate form. The Certificates of Beneficial Interest are * * * transferable, all or in part, only to a parent of the initial owners of said Beneficial Certificates, to a brother or a sister of the initial owners of said Beneficial Certificates, to any initial owners of said Beneficial Certificates, to any natural child of the initial owners of said Beneficial Certificates, or to any natural child of any said child, or to the natural born or adoptive descendants of any of the aforesaid owners of said Beneficial Certificates; in the event of transferance to any outside entity other than natural persons they must not be transferred further, but may be returned to the Trustees for reissue in a manner pursuant to This Declaration of Trust; in the event there is no surviving person or entity qualified under the terms of this Declaration of Trust to be a beneficiary, the then duly constituted *152 Board of Trustees of this Trust shall distribute the Units of Beneficial Interest in their sole discretion, to person(s), charity(ies), organization(s), and/or foundation(s) of their choice; Provided, however, said Board of Trustees of This Trust shall not distribute any of said Units of Beneficial Interest to the Creator-Grantor of This Trust, to the spouse of said Creator-Grantor, to any creditor of said Creator-Grantor, to any creditor of the spouse of said Creator-Grantor, to the estate of said Creator-Grantor, to the estate of the spouse of said Creator-Grantor, to any creditor of the estate of any said Creator-Grantor, or to any creditor of the estate of the spouse of said Creator-Grantor; and the lawful possessor thereof shall be construed the true and lawful owner thereof. Said Beneficial Certificate entitles the holder thereof to a pro rata share of any distribution of income distributed by the Trustees in their sole discretion, and to a pro rata share of the Trust corpus upon the termination of the Trust. Pursuant to IRC Section 674(b), 5(A), and 5(B) the Creator-Grantor of this Trust hereby reserves the right to provide for after-born or after-adopted *153 children or grandchildren through the undistributed reservation of 20 Units of Beneficial Interest for a period not to exceed 120 months from the date of This Declaration of Trust, at the end of which time, in the absence of any further instructions from the Creator-Grantor as to the disposition of the Reserved Units of Beneficial Interest, the then duly constituted Board of Trustees of This Trust shall distribute any remaining of the Reserved Units of Beneficial Interest in their sole discretion, including but not limited to any person(s) or entity(ies) qualified under the terms of This Declaration of Trust to be beneficiaries, charity(ies), organization(s), and/or foundation(s) of their choice; provided, however, said Board of Trustees of This Trust shall not distribute any of said remaining Reserved Units of Beneficial Interest to the Creator-Grantor of This Trust, to the spouse of said Creator-Grantor, to any creditor of said Creator-Grantor, to any creditor of the spouse of said Creator-Grantor, to the estate of said Creator-Grantor, to the estate of the spouse of said Creator-Grantor, to any creditor of the estate of said Creator-Grantor, or to any creditor of the estate of the *154 spouse of said Creator-Grantor. Corpus distribution or current income distribution for these 20 Units shall be chargeable against proportionate units (shares) and shall be held by the Trustees in a special designated account. * * * RESTRICTIONS
Nothing herein contained shall be construed to authorize the Trustees on behalf of the Trust to issue Certificates of Beneficial Interest in excess of the number herein provided, nor for a nominal value at variance with the provisions hereof. * * * DURATION AND CLOSURE
This Trust shall continue for a period of Twenty-five (25) years from the date of this Declaration, unless the Trustees unanimously determine to terminate This Trust at an earlier date as set forth herein. The Trustees may at their discretion, because of threatened depreciation in values, or other good and sufficient reason necessary to protect or conserve Trust assets, liquidate the assets, distribute, and close the Trust at any earlier date determined by them. On termination, the Trust corpus shall be, proportionately and in a pro rata manner, distributed to the Beneficiaries. * * * RENEWAL
At the expiration of this Agreement or such time as the *155 Trustees deem warranted, the then Trustees with the concurrence of all holders of Certificates of Beneficial Interest, if they so desire and believe that Said Trust should not be closed, may renew this Agreement for a like or shorter period. * * * CREATOR-GRANTOR INTENT
Nothing herein contained shall be construed as an intent to evade or contravene any Federal or State Law * * *. The instrument was dated June 22, 1977. The initial designated trustees were Lawrence Edward McKenna and Patricia Ann McKenna, two friends of petitioner. However, they did not appear to remain long as trustees. Although their purported signatures appear on various "minutes" of the trust up to September 29, 1977, there is no indication in the record that they continued to be trustees thereafter. None of the minutes in the record dated after September 29, 1977, bear their signatures or even suggest that they were still trustees or in any way participated as trustees. Meanwhile, on July 1, 1977, petitioner's then wife, Barbara, was elected to the Board of Trustees, and she then became its "Executive Secretary". Further, on September 20, 1977, petitioner himself became a trustee, and was designated *156 the "Executive Trustee", with wide powers over the conduct of the affairs of the trust. Still further, on September 28, 1977, petitioner's oldest child, Dawna Metcalf, who was born in 1958, was appointed a trustee. Thereafter, at least until the end of 1977, petitioner, Barbara, and Dawna appear to have been the only trustees, or certainly, the only "active" trustees. Petitioner and Barbara were divorced in June 1979. She ceased being a trustee and was succeeded as trustee by Mary Nelson Metcalf whom petitioner married in September 1979. Also, at the time of the trial, petitioner's brother Charles had become a trustee, and the trustees then consisted of petitioner, Mary, Dawna, and Charles. As originally constituted, the corpus of the trust consisted of (1) the personal property (tangible and intangible) theretofore owned by petitioner and Barbara and their real estate, primarily their residence, and (2) the "exclusive use" of the "lifetime services" of each of them and "all of the current remuneration accruing therefrom" to each of them. The foregoing "funding" of the trust was purportedly accomplished in the following manner: On June 22, 1977, Barbara signed an affidavit *157 [1] in which she evidenced her alleged conveyance of her interest in "certain of my properties" including "the exclusive use of my lifetime services and all of the current remuneration accruing therefrom" to petitioner for the purpose of his conveying such property to North Star. On July 1, 1977, she executed a bill of sale in which she purportedly "sold" certain "personal property assets" to petitioner for "[t]en dollars and other valuable consideration". Also on July 1, 1977, petitioner executed the following: (1) a bill of sale similar to that which Barbara signed in which he purportedly "sold" the same group of assets [2] to the McKennas, as trustees of North Star, for "[t]en dollars and other valuable consideration"; (2) an affidavit similar to that which Barbara signed in which he evidenced his alleged sale of "certain of my properties" including "the exclusive use of my lifetime services and all of the current remuneration accruing therefrom" to the McKennas as trustees of North Star; and (3) a quit-claim deed pretending to convey certain improved real estate (presumably the family home) from him to the McKennas, as trustees of North Star. On September 30, 1977, petitioner *158 and his wife again signed all of the documents they had signed on July 1, 1977. The beneficial interest in the trust was divided into 100 units evidenced by "Certificates of Beneficial Interest", described in the trust document, supra, p. 5. In return for his purported foregoing transfers to North Star, petitioner received all 100 units of the trust's "Beneficial Interest". On the following day he transferred *159 50 of these units to Barbara and, on July 15, 1977, he transferred 15 units each to his daughters Dawna and Lari and his son Alva, Jr.Also on July 15, 1977, Barbara transferred 15 units to Dawna and 20 units "to be held in reserve for afterborn, afteradopted children or grandchildren". In sum, the beneficial interests in the trust as of the dates specified below were held as follows: Units of Beneficial
Holder of [3]
Date
Interest
Interest
June 22, 1977
100
Petitioner
June 23, 1977
50
Petitioner
50
Barbara
July 15, 1977
5
Petitioner
15
Barbara
30
Dawna
15
Lari
15
Alva, Jr.
20
"[H]eld in
reserve"
*160 The holder of beneficial interest in the trust, as such, had no control over its management. Although the trust document provided that the holder of a "Beneficial Interest" was entitled "to a pro rata share of any distribution of income distributed by the Trustees" (emphasis supplied), there is no evidence that any "distribution" was in fact made. At best, the beneficiaries could be viewed as receiving benefits in respect of the trust only to the extent that they enjoyed the use of the family property, for example, the family home, etc., or to the extent that the trust paid their living expenses, including those relating to the maintenance of the home, etc., as well as providing food, clothing, and the entire range of living expenses. There is no indication in the record whatever that the benefits applicable to each holder of the units of beneficial interest in the trust were in any way proportionate to the number of units allocated to such beneficiary. As previously noted, North Star "employed" petitioner and Barbara as its Executive Trustee and Executive Secretary, respectively. As Executive Secretary, Barbara handled the daily affairs and finances of the trust and was *161 authorized to draw checks on its accounts. Pursuant to agreements that Barbara and petitioner each had with North Star, North Star agreed to remunerate each for "services" rendered and to "supply and furnish" each: 1. Adequate accommodations * * * wherever * * * on Trust Business, and [he/she] * * * agrees to occupy the accommodations furnished as a condition of [his/her] * * * contract * * *; 2. All travel expense incident to all Trust business; 3. All transportation expense incident to all Trust business; 4. All selling expense incident to all Trust business; 5. All office expense incident to all Trust business; 6. All dues, fees, and subscriptions incident to all Trust Business; 7. All entertainment, convention, and meeting expense incident to all Trust business; 8. Adequate life and health insurance to cover medical/dental care expense for [him/her or his/her] * * * dependent(s); 9. All medical, dental, medicinal, and nutritional aids for the well-being of [him/her or his/her] * * * dependent(s); 10. A reasonable, periodic consultant's fee * * * At the time of petitioner's divorce from *162 Barbara, she resigned as trustee and was relieved of any connection with the trust, and since then she has had no beneficial interest therein. The record does not show that she then or at any later time received any assets therefrom or any compensation for any alleged interest in any such assets. Petitioner's principal purpose in establishing the North Star trust was to decrease Federal income taxes. That goal was to be attained by theoretically deflecting his income, primarily his salary, to the trust, which would report the salary thus attributed to it and any other items of income from petitioner's property transferred to it, and would apparently then largely offset such income by deductions for such items as might be included in the wide range of living costs of petitioner and his family paid by the trust. Such deductions were to be claimed on the theory that they represented expenses of the trust incurred in pursuing its objectives. Representatives of EGET had indicated to him that such favorable tax consequences would be attainable. In an attempt to obtain another opinion about the tax consequences of establishing the trust, petitioner consulted "two or three" attorneys *163 in Anchorage, but was told that none of them knew "anything about that kind of stuff". In his income tax returns for 1978 and 1980 petitioner reported his gross income from his employer, Atlantic Richfield, but he offset those amounts by the portions thereof which he theoretically turned over to the Trust, described in his returns as "Nominee Income Paid to Trust". The net amount thus reported as having been received by petitioner from Atlantic Richfield for the theoretical benefit of North Star represented his gross wages minus withholding (for Federal and state income taxes and for FICA taxes). In his 1979 return he achieved the same result by reporting as income only the total amount withheld ($7,517) from his $50,480.72 wages, and did not take any corresponding deduction for "Nominee Income Paid to Trust". His 1978-1980 returns thus show the following in respect of his income from Atlantic Richfield: 1978
1979
1980
Wages
$46,023.53 $7,517.00
$26,687.01 "Nominee Income Paid
to Trust"
(38,097.86)
(23,436.41)
He also reported as gross income "Trustee Fees" in the amounts of $4,992.97, $11,153, and $303 in his returns for 1978, 1979, *164 and 1980, respectively. North Star filed its fiduciary income tax returns on the basis of a fiscal year ending June 30. The record contains copies of its returns only for the fiscal years ending June 30, 1979, and 1980. Although substantial amounts of income were reported, obviously due to petitioner's wages ascribed to it as well as other items, including interest income in the amounts of $6,340 for fiscal 1979 and $6,150 for fiscal 1980, the fiscal 1979 return computed a tax of only $362, and the fiscal 1980 return computed a tax of "None". These favorable results were obtained only as a consequence of substantial aggregate deductions claimed for interest, taxes, fiduciary fees, "Travel on Trust Business", "Insurance Premium", "Trustee Medical", "Housing Provided as Convenience" (or "Trustee Housing"), "Miscellaneous Expenses", depreciation for house and furnishings, as well as depreciation separately for "Color TV", "Stereo", "Washer", and "Dryer". In accordance with EGET's undertaking to prepare petitioner's returns for a period of two years, it did prepare his 1977 return. However, although petitioner forwarded to it the necessary information to prepare his 1978 return, *165 it did not do so and ignored all communications from him. After waiting about a year and making numerous inquiries, petitioner arranged for someone else to prepare his 1978 individual Federal income tax return. That return was filed on August 18, 1980. In his deficiency notice herein, the Commissioner increased petitioner's income for each of the tax years 1978 through 1980 by the respective portion of his Atlantic Richfield salary which he excluded from his income on the ground that it was taxable to North Star, and reduced his income by the respective amounts reported each year as "Trustee Fees". In addition, the Commissioner increased petitioner's 1978 and 1979 income by the respective amount that the trust reported each year as interest income, and disallowed deductions in the amounts of $4,153 and $1,360 taken in 1979 and 1980, respectively, as charitable contributions to the Universal Life Church. Petitioner has since conceded the disallowance of the deductions for these claimed charitable contributions. Shortly after learning that the IRS was questioning his method of reporting income, he ceased "transferring" to the trust or allocating to it any of his earnings, and *166 has since not "placed" any "wages, salaries or income * * * into the trust". It is his position that the trust agreed not to enforce his assignment of his "lifetime services" to it until the taxability issues were resolved. OPINION At the beginning of the trial petitioner attempted to prove that he established the trust primarily for reasons unrelated to taxes and that he regarded potential tax savings as a "side" benefit. He testified that he went to work in 1977 on a pipeline at Prudeo Bay, Alaska, that he flew to work weekly over the Brooks Range, and was concerned about what would happen to his children in the event of a plane crash. He was particularly concerned, because, he stated, his wife "was more than rather a little bit unstable; she was an alcoholic". And he indicated that he feared that "$700,000 in insurance and property pay-offs" would end up in the hands of somebody who would just "flitter [sic] it away" to the disadvantage of his children. Accordingly, he testified, after talking and listening to the representatives of EGET, he decided "to create an estate so that in the event the plane does in fact go down", the estate "would be maintained to see the education *167 of my children". Petitioner appeared to be sincere, and we were almost persuaded at the start as to his purpose, but our tentative view changed as the rest of the evidence unfolded and as we examined the documentary materials in the record. We are now thoroughly convinced that, if it were relevant, the purpose of the trust was nothing more than to attempt to take advantage of the currently familiar tax dodge commonly referred to as a "family trust", and that any purpose that petitioner may have had other than reduction in taxes was at best only minimal. To be sure, petitioner's relationship with his wife Barbara was probably not a completely happy one -- they were divorced some two years later. But petitioner certainly did not regard her as unreliable and financially imprudent. She was made one of the original trustees and was the Executive Secretary of the trust, empowered to carry on its day to day affairs with authority to draw checks on its accounts. This is hardly consistent with the picture that petitioner attempted to portray of her. Nor is it consistent with petitioner's stated purpose in creating the trust. Although there were two other original trustees, the McKennas, *168 the record fails to show that they exercised any real control over its affairs, and indeed the materials before us strongly suggest that they were not intended to remain very long even as trustees in name. As we view the totality of evidence in this case, the trust represented no more than an attempt to deflect petitioner's wages and other income in order to avoid taxes. That attempt must fail here as it has in numerous other cases. The matter hardly requires extended discussion, but we shall give some indication of the course of decision in this field. After examining trust arrangements virtually identical to North Star, this Court has held either that they were shams without effect for Federal income tax purposes, Markosian v. Commissioner,73 T.C. 1235 (1980), or that the income in question was taxable to the trusts' grantors as anticipatory assignments of income or pursuant to the grantor trust provisions of sections 671 through 679, I.R.C. 1954. Vercio v. Commissioner,73 T.C. 1246 (1980); Wesenberg v. Commissioner,69 T.C. 1005 (1978). Because North Star differs in no significant way from the *169 trusts discussed in Vercio and Wesenberg we sustain the Commissioner's determination that petitioner is liable for tax in respect of the full amount of his Atlantic Richfield salary and the interest income reported by the trust. Specifically, we find, first, that his assignment of his lifetime services to the trust constituted merely an anticipatory assignment of his earnings, without effect for Federal income tax purposes, and, second, that he is to be treated as the owner of the interest income under section 674, section 676, or section 677. We additionally find in connection with our latter holding that, although Dawna Metcalf may be an "adverse party" as defined in section 672(a), her membership on the North Star Board of Trustees does not create the type of adverse relationship which would nullify petitioner's power to control the trust's benefit. There was no credible evidence that she in fact ever exercised, or was intended to exercise, any authority whatever in respect of the trust other than signing what appear to be form minutes that were part of the package purchased by petitioner from EGET. Moreover, the trust instrument provides that trust actions may be taken *170 upon a majority vote and at all times "nonadverse" parties constituted a majority of the board. Section 672. See Vercio v. Commissioner,supra,73 T.C. at 1256-1258; Wesenberg v. Commissioner,supra,69 T.C. at 1012. The principles extensively analyzed and applied in the foregoing cases are equally applicable here. See also Schulz v. Commissioner,T.C. Memo. 1980-568, which the Court of Appeals for the Seventh Circuit affirmed, 686 F.2d 490 (1982), stating (pp. 492-493): It takes no particular acumen in tax law to know that the * * * family trusts cannot be treated like ordinary trusts. The only real question is which of several established doctrines the Internal Revenue Service should use to deny their existence as taxable entities. * * * It is fundamental to our income tax regime that personal consumption expenditures--food, clothing, travel, education, entertainment--do not generate income tax deductions unless they are somehow inextricably linked to the production of income. When taxpayers buy cars, *171 travel, or take out life insurance policies, they make those expenditures out of after-tax dollars. The trust devices here are a transparent attempt to alter that state of affairs by turning all the families' activities into trust activities and all the families' expenses into expenses of trust administration. If this device worked, the * * * [taxpayers] would, unlike the rest of us, make all their consumptive expenditures with pre-tax dollars. [Footnote reference omitted.] Nothing more need be said here. Petitioner cannot escape taxes by use of any such device as the North Star "family trust". There remains for consideration the additions to tax determined by the Commissioner pursuant to sections 6651(a)(1) and 6653(a). Section 6651(a)(1). Petitioner's 1978 return was filed August 18, 1980, some 16 months after it was due to be filed. In case of a failure to file a timely return, section 6651(a)(1) provides in effect that there be added to the amount required to be shown as tax on the return five percent of that amount per month of late filing up to an aggregate of 25 *172 percent unless such failure is due to reasonable cause and not to willful neglect. Petitioner maintains that these provisions are inapplicable here because he timely requested EGET to prepare his return. However, it has been established that reliance upon another to prepare or file a return known to be due does not constitute "reasonable cause" for avoiding the section 6651(a) addition to tax. United States v. Kroll,547 F.2d 393, 396 (7th Cir. 1977). Cf. United States v. Boyle, 469 U.S.     (Jan. 9, 1985). We sustain the Commissioner's determination of the section 6651(a)(1) addition to tax for 1978. Section 6653(a).Section 6653(a) provides in substance that if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations, five percent of the underpayment shall be added to the tax. The Commissioner determined additions to tax under these provisions for each of the three years 1978-1980. The burden of proof in respect *173 of such additions is upon the taxpayer. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Petitioner has certainly failed to carry that burden as to 1979 and 1980 when he claimed deductions for alleged charitable contributions to the Universal Life Church. He has since conceded that no such deductions are allowable, and has not submitted any evidence whatever to show that to the extent that any portion of the respective deficiencies for these years was attributable to such deductions, the underpayments were not due to negligence or intentional disregard of rules and regulations. A different situation exists for 1978, when there were no deductions claimed for contributions to the Universal Life Church. As to 1978, the deficiency rests solely on charging petitioner with accountability for the income of the trust, by ignoring the trust as an entity entitled to recognition for tax purposes, as well as on the application of the assignment of income doctrine, and alternatively, on the treatment of petitioner as the grantor-owner of the trust under sections 671-677. Petitioner did present evidence about his concern as to whether the trust would be effective to reduce *174 his taxes, the assurances (qualified, perhaps) given to him by representatives of EGET, and his consultation of two or three lawyers in Anchorage. The latter told him that they didn't know "anything about that kind of stuff". Yet, petitioner decided to go ahead with establishing the trust and reporting his income as recommended by the slick representatives of EGET. Although the matter may not be completely free from doubt, we think that petitioner was negligent in accepting the rosy (even though possibly hedged) promises of persons who were plainly not disinterested. We are influenced by his failure to get a favorable, or at least a reasonably encouraging, opinion from an independent source, particularly, when he should have been alerted to the possibility that something might be wrong upon being told by the lawyers actually consulted that they didn't know "anything about that kind of stuff". Surely, where such extraordinarily favorable tax results are promised by interested persons, ordinary prudence would seem to call for further effort to obtain confirmation from an independent source. Notwithstanding that Alaska is many miles from the contiguous 48 states, we refuse to believe *175 that it would have been unreasonably difficult to locate a lawyer in Anchorage who could not have given petitioner appropriate advice. We found petitioner to be an intelligent person, and in our best judgment he has not carried his burden of proof. Cf. Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1983); Aagaard v. Commissioner,T.C. Memo. 1985-194, 49 TCM 1278, 1283-1284, 54 P-H Memo T.C. par. 85,194. Decision will be entered for the respondent.
Footnotes
1. Barbara signed this document twice, apparently on two different occasions, once on June 22, 1977, and again, before a Notary Public, on September 30, 1977. ↩
2. A schedule attached to the two bills of sale identifies the assets as life insurance policies and contents (furniture, furnishings, etc.) of the family home, described in detail on a room by room basis, as well as such personal and miscellaneous items as curling iron, skis, vacuum cleaner, and even such contents of the garage as two shovels, rake, and pick. The evidence does not establish that the basic contents of the house, other than personal items plainly applicable to Barbara, really belonged to her rather than to petitioner or that she had anything more than merely an "interest" in such basic contents.↩
3. The parties in their original Stipulation of Facts agreed that: The holders of beneficial interests in the North Star Trust from the date of its creation to the present are Alva W. Metcalf, Jr. (petitioner's son), Lari D. Metcalf (petitioner's daughter) and Dawna K. Metcalf (petitioner's daughter). Each holds 33 1/3 of the 100 units of beneficial interest. However, the record shows that petitioner had refused, up to and well into the trial, to make the "minutes" of the trust available to Government counsel on some kind of claim of privilege, and it is therefore clear that the stipulation was entered into by the parties at a time when the Government was kept in the dark as to the contents of the minutes. But the minutes were later submitted to the Court after the trial by the way of a Supplemental Stipulation, and the distribution of the beneficial interest appearing in the Supplemental Stipulation was as set forth above in the body of these Findings. In the circumstances, to the extent that the original stipulation is at variance with the materials in the Supplemental Stipulation, we have made our findings in accordance with the latter.↩