## LOUIS MARKOSIAN AND JOAN P. MARKOSIAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10775–77.    Filed March 31, 1980.

*Paul T. Wright,* for the petitioners.
*Richard A. Jones,* for the respondent.

DRENNEN, *Judge:* Respondent has determined a deficiency of $10,312 in petitioners' income tax for the taxable year 1975. The issues for our decision are:

(1) Whether a trust purportedly created by petitioners is entitled to be recognized as an entity separate and distinct from the taxpayers;

(2) Alternatively, whether the taxpayers are to be treated as owners of the trust under sections 671 through 677, I.R.C. 1954;[1] and

(3) Whether a management fee paid by petitioners to the trust created by them is deductible under section 162.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Louis R. Markosian (Louis) and Joan P. Markosian (Joan), are husband and wife, whose legal residence was in Phoenix, Ariz., at the time of their filing of the petition herein. (Louis and Joan will hereinafter sometimes be referred to collectively as petitioners.) The petitioners filed their joint

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year at issue, unless otherwise indicated.

Federal income tax return for the taxable year 1975 with the Western Region Service Center, Ogden, Utah.

Louis is a licensed dentist and has been engaged in the practice of dentistry for 23 years. The majority of petitioners' assets had been acquired with Louis' earnings from his dental practice in Arizona, a community property State.

Petitioners have resided in Arizona as husband and wife for the past 19 or 20 years as of the date of trial. The petitioners' children are, and their respective ages at the end of 1975 were, as follows:

| | |
|---|---|
| Philip Markosian ....... 15 years | John Markosian ........ 12 years |
| Julie Markosian ........ 14 years | Gary Markosian ........ 9 years |

On or about January 11, 1975, petitioners executed a document captioned "Declaration of Trust of This Pure Trust." This trust indenture was published by Educational Scientific Publishers (ESP) and consisted of a preprinted form with blank spaces provided for petitioners' names. Petitioners executed this document based on the advice of physician friends and representations made by an attorney employed by ESP. The representations were to the effect that the trust resulting from the execution of the ESP documents would be viable for Federal tax purposes. The attorney also stated that he would defend the trust at his cost in any proceedings before the Internal Revenue Service.

The trust that was purportedly established was styled the "Louis R. Markosian Equity Trust" (the trust). The trust provided in part, as follows:

The above named Trustees, for themselves and their successors In Trust, do hereby agree to accept properties real and personal to be conveyed and acknowledge acceptance of and delivery of all of the property specified, together with all the terms of The Trust herein set forth, agreeing to conserve and improve The Trust, to invest and reinvest the funds of Said Trust in such manner as will increase the financial rating of The Trust (Estate) during the period of outstanding liabilities of the various properties and enterprises in commerce for gain, exercising their best judgment and discretion, in accordance with The Trust Minutes, making distributions of portions of the proceeds and income as in their discretion, and according to the minutes, should be made, making complete periodic reports of business transactions, and upon final liquidation distributing the assets to the beneficiaries as their interests may appear; and in all other respects administering Said Trust (Estate) in good faith strictly in conformity hereto.

## EXPENDITURES

The Trust shall fix and pay compensation of all officers, employees or agents in their discretion, and may pay themselves such reasonable compensation for their services as may be determined by a MAJORITY of the Board of Trustees.

## TRUSTEES' DECLARATION OF PURPOSE OF THIS EXPRESS EQUITY PURE TRUST

THE DECLARED PURPOSE OF THE TRUSTEES OF THIS TRUST shall be to accept rights, title and interest in and to real and personal properties, whether tangible or intangible, conveyed by THE CREATOR HEREOF AND GRANTOR HERETO to be the corpus of THIS TRUST. Included therein is the exclusive use of his lifetime services and ALL of his EARNED REMUNERATION ACCRUING THEREFROM,

from any current source whatsoever, so that Louis Markosian grantor-creator's name can maximize his lifetime efforts through the utilization of his Constitutional Rights; for the protection of his family in the pursuit of his happiness through his desire to

promote the general welfare, all of which Louis Markosian grantor-creator's name _____ feels he will achieve because they are sustained by his RELIGIOUS BELIEFS.

*    *    *    *    *    *    *

## DURATION-CLOSURE

This Trust shall continue for a period of twenty-five years from date, unless The Trustees shall unanimously determine upon an earlier date. The Trustees may at their discretion, because of threatened depreciation in values, or other good and sufficient reason to protect or conserve trust assets, liquidate the assets, distribute and close The Trust at any earlier date determined by them. The Trust shall be proportionately and in a pro rata manner be distributed to the beneficiaries.

## POWERS OF TRUSTEES

Trustees may do anything any individual may legally do in any state or country, subject to the restrictions herein noted. They shall continue in business, conserve the property, commercialize the resources, extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of THIS TRUST, such as, viz: buy, sell or lease land for the surface or mineral rights; buy or sell mortgages, securities, bonds, notes, leases of all kinds, contracts or credits of any form, patents, trademarks, or copyrights; buy, sell or conduct mail-order business, or branches thereof; operate stores, shops, factories, warehouses or other trading establishments or places of business of any kind; construct, buy, sell, lease or rent suitable buildings or other places of business; advertise different articles or business projects; borrow money for any business project, pledging The Trust property for the payment thereof; hypothecate assets, property, or both, of The Trust in

business projects; own stock in, or entire charters of corporations, or other such properties, companies, or associations as they may deem advantageous.

A Minute of Resolutions of The Board of Trustees authorizing what it is they determine to do or have done shall be evidence that such an act is within their power. Anyone lending or paying money to The Trustees shall not be obliged to see the application thereof; all funds paid into the treasury are and become a part of the CORPUS of THIS TRUST.

### ADMINISTRATION

The Trustees shall regard this instrument as their sufficient guide, supplemented from time to time by their resolutions (said resolution to be ratified ALWAYS by a MAJORITY of the Trustees then in office and participating in the issuing meeting) covering contingencies as they arise and are recorded in the minutes of their meetings, which are the by-laws, rules and regulations of THIS TRUST.

The initial trustees of the trust were Joan and a Martha Zeigler, a neighbor of petitioners. Louis became a trustee almost immediately after creation of the trust. On February 9, 1975, Martha Zeigler resigned, leaving the petitioners as the only trustees for the balance of 1975.

On the date the trust indenture was executed, petitioners purportedly conveyed to the trust various items of real and personal property. These items included petitioners' personal residence, home furnishings, life insurance policies, savings accounts, and all of the dental equipment used in Louis' practice. Additionally, Louis conveyed his "lifetime services including all his earned remuneration therefrom, from any current source whatsoever." In exchange for this conveyance, Louis received 100 units of beneficial interest, which constituted all the units of beneficial ownership of the trust.

Due to various transfers, on February 8, 1975, the units of beneficial ownership were owned as follows:

| | |
|---|---|
| Louis Markosian........ 25 units | Julie Markosian........ 10 units |
| Joan Markosian......... 25 units | John Markosian........ 15 units |
| Philip Markosian ....... 10 units | Gary Markosian........ 15 units |

These units of beneficial ownership were evidenced by certificates which stated, in part:

This Certificate conveys no interest of any kind in The Trust assets, management or control thereof.

Benefits hereby conveyed consist solely of emoluments[2] as distributed by the action of the Trustees and nothing more. * * *

The petitioners, themselves, did not attempt to make any separation between "emoluments" and other types of income or between income and corpus, either in terms of expenditures, retained assets, or distributions.

By document dated March 1, 1975, and styled "Agreement and Contract" entered into by Louis and the trust, the trust purportedly agreed to assume all nonprofessional responsibilities of the dental practice, including providing all office space, equipment, furnishings, and salaried personnel. In return for providing those services and equipment, the trust was to receive a fee equal to 80 percent of the gross income from Louis' dental practice. The 80-percent figure was suggested by ESP and no attempt was made to determine the actual value of Louis' service or the fair value for the use of the equipment and services. Although Louis retained 20 percent of the gross receipts, he would not have worked as a dentist under any other circumstances for the sums actually retained by him under this agreement. Furthermore, although Louis had executed a document which purported to convey all remuneration from his future services to the trust, he still considered himself entitled to 100 percent of the gross receipts from his dental practice. In this regard, all of the receipts were initially deposited in his personal account. Thereafter, petitioners periodically drew checks on the personal account and deposited them in an account established for the trust.

On their 1975 income tax return, petitioners reported on Schedule C, Profit or (Loss) From Business or Profession (Dentist), gross receipts of $99,248, and deducted various expenses such as depreciation, taxes on business property, salaries and wages, office supplies, professional services,[3] and a "management fee" of $64,555, reflecting a net profit of $28,982 on which they computed their tax. The management fee of $64,555 was paid to the trust. The fiduciary return filed for the trust for the period March 1, 1975, to February 29, 1976, reported income from dividends ($10,607), interest ($234), capital gain ($74,767),

---

[2]ESP provided a glossary which defined emoluments as profits from office, employment, or labor; compensation; fees or salary.

[3]These were business expenses for the period Jan. 1, 1975, to Mar. 1, 1975.

and management fee ($77,059). Deductions claimed totaled $57,783, leaving a net of $104,884, all of which was reported as distributed to the beneficiaries. However, except for small amounts occasionally charged to the various beneficiaries' accounts, the distributions were left in the trust for investment.

The petitioners, as trustees, had sole decisional and day-to-day management responsibilities with respect to the trust. In this capacity, they authorized the trust to expend funds to pay the mortgage, utility, general maintenance, and repair and replacement costs with respect to the residence and furnishings that they had purportedly transferred to the trust. Additionally, the trust paid for all expenses relating to Louis' dental practice. These funds were paid out of the bank account that petitioners established in the name of the trust.

After the execution of the trust document and various conveyances and agreements relating to the purported transfers in trust, Louis' dental practice was in all respects operated in the same manner as prior to the execution of these documents. Additionally, even though petitioners' residence and furnishings were transferred to the trust, it was at all times understood that the property was to be used to the same extent and in the same manner as before the transfer. No specific charge was paid by petitioners to the trust for rental of the office, equipment, or home and furnishings.

Petitioners felt that the trust instrument imposed no restrictions on their use of the property; additionally, they felt that the trust imposed no restrictions on their transferring trust properties to third parties who were not beneficiaries, such as charities, without consideration.

By statutory notice of deficiency, respondent determined a deficiency of $10,312 for petitioners' 1975 taxable year. This determination was made by disregarding the trust as a separate entity and attributing income, except the management fee, and allowable deductions[4] reported by the trust on its fiduciary income tax return (Form 1041) to petitioners, individually, and disallowing petitioners' deduction of the management fee.

---

[4]In reaching his determination, respondent disallowed or reduced certain deductions claimed by the trust. These adjustments are not challenged by petitioners.

## OPINION

Respondent initially contends that the trust had no legal existence under the laws of the State of Arizona. We need not decide this issue, for even assuming its validity, this trust cannot be recognized as a separate jural entity for Federal income tax purposes.

Technical considerations and legal niceties of the law of trusts which petitioners seek to hide behind will not obstruct our view when the sole purpose for this subterfuge is the avoidance of Federal income tax. To be sure, a taxpayer has the legal right to minimize his taxes or avoid them totally by any means which the law permits. See *Gregory v. Helvering*, 293 U.S. 465, 469 (1935). However, this right does not bestow upon the taxpayer the right to structure a paper entity to avoid tax when that entity does not stand on the solid foundation of economic reality. When the form of the transaction has not, in fact, altered any cognizable economic relationships, we will look through that form and apply the tax law according to the substance of the transaction. *Furman v. Commissioner*, 45 T.C. 360 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967). It is axiomatic that a deficiency is proper on the ground that "regardless of regularity of form as a matter of plutological reality, there is no change in economic ownership." *Burde v. Commissioner*, 352 F.2d 995 (2d Cir. 1965); *Furman v. Commissioner, supra.*

This trust was created by a declaration of trust made by Louis, naming Joan and Martha P. Zeigler as trustees, which they accepted. Louis was substituted for Zeigler as trustee almost immediately. Louis, as grantor, agreed to sell, assign, and deliver to the trustees, in trust, various types of properties. The trustees agreed to accept the properties and manage them in a manner which, in their judgment, was for the best interests of the trust, making distributions of portions of the proceeds and income as in their discretion should be made, and upon final liquidation, distributing the assets to the beneficiaries as their interests may appear. The trustees were given broad powers with respect to the trust property, and a "Minute of Resolutions" of the board of trustees authorizing "what it is they determine to do * * * shall be evidence that such an act is within their power." The trustees' "Declaration of Purpose" was to accept the properties conveyed to the trust by the grantor, including therein the "exclusive use of his lifetime services and all of his earned remuneration

accruing therefrom," so that grantor "can maximize his lifetime efforts through the utilization of all of his Constitutional Rights" for the protection of his family. The beneficial interests were divided into 100 units in the certificate form attached to the trust indenture. Ownership of a beneficial certificate did not give the holder any title to, interest in, or right to manage the trust property. The trust was to continue for 25 years, but the trustees could unanimously terminate it at an earlier date. Upon termination, the trustees were to liquidate the assets and distribute them pro rata to the beneficiaries.

The certificates of beneficial interest clearly stated that they conveyed no interest in the trust assets, management, or control thereof, and that the benefits conveyed thereby consisted solely of the "emoluments as distributed by the action of The Trustees and nothing more." The certificates were transferable.

The minutes of the first meeting of the trustees indicate that they received from Louis an offer to convey all of his interest in real and personal property listed therein (which included practically all of petitioners' personal and business assets) and the exclusive use of his lifetime services and all his earned remuneration therefrom, and that they accepted the offer. Louis subsequently executed a deed and affidavit conveying the aforementioned properties to the trust.

In form, this trust might be valid, although it leaves many uncertainties as to the rights of the beneficiaries, particularly with respect to income that did not qualify as "emoluments." "Emoluments" were defined in the glossary as "Profits from office, employment or labor; compensation; fees or salary." The income of the trust consisted of dividends, interest, capital gain, and the 80-percent fee. The dividends, interest, and capital gain do not qualify under the definition of emoluments and it is doubtful that the fee does. The amount of the fee was not based on any determined value of services rendered or property used— it was picked out of the air. Consequently, it is doubtful that there was any income to which the beneficiaries were entitled, or that there were any designated beneficiaries for the income actually received by the trust. Cf. *Furman v. Commissioner, supra* at 365.

But even if in form the trust was valid, it was not administered like a trust. First, the terms of the trust and supporting documents were not adhered to. Louis purportedly conveyed his

lifetime services and all his earned remuneration therefrom to the trust, but, in fact, Louis received all of the income from his dental practice and paid 80 percent thereof to the trust purportedly as a fee.[5] Second, the evidence shows a lack of recognition by petitioners of any fiduciary responsibilities in dealing with the trust. In this regard, we note:

(1) Petitioners, as trustees, did not use reasonable care and felt no compulsion to make the trust properties productive (see 1 Restatement, Trusts 2d, sec. 181 (1959)), as evidenced by fact that a major asset of the trust, the house and furnishings, was used rent free by petitioners.

(2) They made no effort to determine whether the management fee was reasonable. In fact, the fee was suggested by a representative of ESP rather than by petitioners, themselves. This, in itself, reveals a violation of the prohibition against delegation. See 1 Restatement, Trusts 2d, secs. 171–174 (1959).

(3) Petitioners, as trustees, made no effort to collect the entire 100 percent of the gross income from Louis' dental practice to which the trust was entitled under the agreement. See *Audano v. United States*, 428 F.2d 251 (5th Cir. 1970).

It is apparent that petitioners did not exercise ordinary duties of trustees in accordance with the "strict principles of a fiduciary in the management of the property." *Van Zandt v. Commissioner*, 341 F. 2d 440, 443 (5th Cir. 1965).

But, more important, there was no economic reality or substance to the transaction which purportedly transferred everything petitioners owned, including Louis' future income, to the trust.

First, the relationship of the grantors to the property transferred did not differ in any material aspect before and after the creation of the trust. Petitioners conducted their business and lived their private lives exactly the same as before the trust was created. Louis continued his dental practice in the same office, using the same equipment that he used before. Petitioners lived in the same house with the same furnishings it had before. The

---

[5] In *Wesenberg v. Commissioner*, 69 T.C. 1005 (1978), the same printed documents were used to establish a trust, but the entire professional income of the grantor was paid to the trust. We held that the income was taxable to the grantor under the assignment-of-income doctrine. Perhaps the deviation from the contemplated plan here was an effort to avoid that doctrine. See also *Vercio v. Commissioner*, 73 T.C. 1246, decided this same day, wherein the same documents were used.

only difference was that petitioners, as trustees, rather than individually, paid most of the expenses involved in those activities. However, the funds used to pay these expenses came from Louis' dental practice.

Second, petitioners, as equal grantors,[6] were also cotrustees with no person independent[7] of their wishes empowered to prevent them from acting in derogation of the interests of the other beneficiaries. See *Furman v. Commissioner, supra; Audano v. United States, supra.*

Third, we cannot perceive of any economic interest which passed to the other beneficiaries under this trust arrangement. As trustees, petitioners were invested with broad powers to amend the trust by resolution "covering contingencies as they arise." The mere fact that a resolution was enacted was evidence that any action taken pursuant thereto was within their power as trustees. These powers to amend, when read in conjunction with the extraordinary broad purposes of the trust, show that Louis and Joan had unlimited power to deal with the trust res in any way they saw fit. See *Wesenberg v. Commissioner,* 69 T.C. 1005 (1978). We believe this power included the power to allocate all income earned to themselves as beneficiaries in derogation of the interests of the other beneficiaries. There was nothing in the trust indenture or the certificates of beneficial interests which required petitioners to treat all beneficiaries equally when distributing or allocating income. It would also appear that petitioners had the power to revest the corpus in themselves at any time under this contingency clause. See *Wesenberg v. Commissioner, supra* at 1013.

Fourth, petitioners did not feel bound by any restrictions imposed by this trust or the law of trusts. At trial, Louis stated that he felt the trust imposed no substantial restrictions on his use of the trust property. Furthermore, he felt that the trust conferred upon him, as trustee, the authority to deplete the corpus by conveying the trust property to charities without consideration.

In our opinion, the above factors, together with the lack of any valid purpose other than the avoidance of tax, are enough

---

[6]As all property transferred was owned by Louis and Joan as community property, they are both considered as grantors of the trust. See Ariz. Rev. Stat. sec. 25–211 (1976).

[7]We have disregarded Martha Zeigler as she was a mere nominee of petitioners who served for less than 1 month without performing any duties.

to deprive the trust of all trappings of economic reality and mandate that we disregard this attempt to shift income by creation of this paper entity. *Furman v. Commissioner, supra; Mathews v. Commissioner,* 520 F.2d 323 (5th Cir. 1975), revg. on other grounds 61 T.C. 12 (1973); *Audano v. United States, supra.* See also *Wesenberg v. Commissioner, supra; Vercio v. Commissioner,* 73 T.C. 1246 (1980); *Van Zandt v. Commissioner, supra.*

In summary, since petitioners were free to deal with the trust property and, in fact, did deal with the trust property free from fiduciary restraints, as a matter of economic reality there was no separation of legal title from beneficial enjoyment and, as such, this trust is a nullity under the tax laws. Despite the avowed purpose of the trust, (i.e., to maximize Louis' lifetime efforts through the utilization of his constitutional rights; for the protection of his family in the pursuit of his happiness through his desire to promote the general welfare, all of which Louis feels he will achieve because they are sustained by his religious beliefs) we find the actual purpose to have been only to divide Louis' income with the other members of his family and thus reduce his taxes. "The inescapable conclusion flowing from the touchstone of economic reality is that the trust should not be recognized * * * for Federal income tax purposes." *Furman v. Commissioner, supra* at 364.

This is not to say, as a general rule, that income from a trust legally created and administered may be lightly attributed to the settlor outside of the statutory provisions provided by Congress in sections 671 through 677.[8] However, when the settlor is trustee and the beneficiaries are the settlor and his family, such trust arrangements must be closely scrutinized for economic substance. *Helvering v. Clifford,* 309 U.S. 331 (1940). We can find no substance in this arrangement. Since petitioners did not respect this trust as a separate entity, we can see no reason to do so, and we therefore sustain respondent's determination.

This finding also disposes of the question of the deductibility of the management fees paid by petitioners to the trust as deductions, for payments to "economic nullities" are not con-

---

[8]We emphasize that our decision is based on lack of economic reality rather than on retention of dominion and control over the trust by petitioners. Secs. 671 through 678 are not the exclusive means by which to attribute income to the grantor. See *Furman v. Commissioner,* 45 T.C. 360 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967).

templated by section 162. *Mathews v. Commissioner, supra* at 325. Additionally, our holding makes it unnecessary to consider the application of sections 671 through 677 to the facts in issue.[9]

In his statutory notice, respondent reduced or disallowed entirely some of the deductions of the trust which he reallocated to petitioners. Respondent's determinations as to the amount of the allowable deductions are not challenged by petitioners, and will therefore be sustained.

*Decision will be entered for the respondent.*

---

[9]See, however, *Vercio v. Commissioner, supra.*