OTIS W. MILLER AND BEVERLY MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket No. 12672-86
United States Tax Court
T.C. Memo 1988-543; 1988 Tax Ct. Memo LEXIS 572; 56 T.C.M. (CCH) 728; T.C.M. (RIA) 88543; November 29, 1988
Guy G. Curtis, for the petitioners. Bruce A. Anderson, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax for the years and in the amounts as follows: Section
Section
Section
Section
Year
Income Tax
6653(a) [1]
6653(a)(1)
6653(a)(2)
6661
Section
Section
Section
Section
Year
Income Tax
6653(a) [1]
6653(a)(1)
6653(a)(2)
6661
12/31/78
$  9,422.00
$ 471.00
12/31/79
4,144.00
207.00
12/31/80
4,066.00
203.00
12/31/81
13,397.00
670.00 *
12/31/82
12,185.00
609.00 **
$ 1,219.00
12/31/83
7,133.00
357.00 ***
713.00
Totals
$ 50,347.00
$ 881.00
$ 1,636.00
$ 1,932.00
*574 Some items have been disposed of by agreement of the parties leaving the following issues for decision: (1) whether income and expenses reported by certain trusts were properly so reported or should have been reported as income and expenses of petitioners, (2) whether petitioners are entitled to depreciation deductions with respect to certain automobiles used in Otis W. Miller's medical practice in excess of the amounts allowed by respondent, (3) whether petitioners have shown that they are entitled to deductions with respect to a KEOGH plan in excess of the amount allowed by respondent, and (4) whether petitioners are liable for additions to tax under the I.R.C. of 1954, section 6653(a) or section 6653(a)(1) for each of the years here in issue, under section 6653(a)(2) for the years 1981, 1982 and 1983, and under section 6661 for the years *575 1982 and 1983. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time the petition in this case was filed, petitioners resided in Ord, Nebraska. They filed joint Federal income tax returns for the calendar years 1978, 1979, 1980, 1981, 1982 and 1983 on Forms 1040. During all of the years here in issue and for a number of years prior thereto, petitioner, Otis W. Miller, was a medical doctor engaged in the practice of his profession in Ord, Nebraska. Both petitioners during the years here in issue were engaged in a horse raising activity on land adjacent to the home in which they lived and in the sale of vitamins. In 1976, petitioners purchased a family trust package from Educational Scientific Publishers (ESP) for $ 4,500. Some of the blank spaces in the documents were filled in in writing at the time petitioners received the documents. Petitioners discussed these documents with representatives of ESP, but with no other persons. One of the documents contained in the package was entitled "Declaration of Trust." This document stated that it authorized its trustees to operate under the name of the Otis W. Miller Family Trust (OMFT). *576 It further recited that the agreement, conveyance and acceptance are made and entered into at the time and on the date appearing in the acknowledgment thereto attached, by and between Otis W. Miller, "who drafted this irrevocable family trust as THE CREATOR THEREOF and GRANTOR HERETO," and Beverly Ann Miller, Trustee, and Andrew M. Kaminski, Trustee "ACCEPTORS hereof in joint tenancy who shall compose The Board of Trustees and Executive Officers for conducting said business." The document stated that the trustees shall not be less than two in number, but may be increased for practical reasons beneficial to the trust. It provided that the trustees herein mentioned by name or their successors elected to fill vacancies, shall hold office, have and exercise collectively the exclusive management and control of the trust property and business affairs. The document granted to the trustees very broad powers. The first sentences under the paragraph "Powers of Trustees" stated that the "Trustees may do anything any individual may legally do in any state or country, subject to the restrictions herein noted. They shall continue in business, conserve the property, commercialize the resources, *577 extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of THIS TRUST, * * *." The restitution of powers then included, but was not limited to buying, selling and leasing property, including mineral rights, patents, trademarks, or copyrights; conduct a mail-order business, operate stores, shops, factories, warehouses or any other trading establishments, advertise different articles or business projects, borrow money for any business project, pledging the trust property for the payment thereof, hypothecate assets, property, or both, of the trust in business projects, own stock in, or entire charters of corporations, or other such properties, companies, or associations as they may deem advantageous. The document further stated: The declared purpose of the Trustees of THIS TRUST shall be to accept rights, title and interest in and to real and personal properties, whether tangible or intangible, conveyed by the creator hereof and grantor hereto to be the corpus of THIS TRUST. Included therein is the exclusive use of his lifetime services and all of his earned remuneration accruing therefrom, from any current *578 source whatsoever, so that Otis W. Miller can maximize his lifetime efforts through the utilization of his Constitutional Rights; for the protection of his family in the pursuit of his happiness through his desire to promote the general welfare, all of which Otis W. Miller feels he will achieve because they are sustained by his RELIGIOUS BELIEFS. The document further stated: This Trust is expressly irrevocable, and may not be altered or amended in any respect unless specifically authorized by this instrument, and it may not be terminated except through distributions permitted by this instrument. The document further stated under the title Certificates of Beneficial Interests as follows: The Beneficial Interests, as a convenience, for distribution are divided into One Hundred (100) Units, substantially in the certificate form hereto attached. They are non-assessable non-taxable (under the provisions of Section 1002 of Internal Revenue Code), non-negotiable but transferable; and the lawful possessor thereof shall be construed the true and lawful owner thereof. The lawful owner may, if he so desires, cause his Beneficial Certificate to be *579 registered with the Secretary of the Trustee. The "Trust" provided that it should continue for a period of 25 years unless the trustees unanimously determined an earlier termination date. The document was signed under the date of June 16, 1976, by Otis W. Miller, "Grantor-Creator," and was signed by Beverly Ann Miller and Andrew M. Kaminski as Trustees. As of June 16, 1976, Andrew M. Kaminski resigned as trustee and Otis W. Miller was elected as trustee and became a trustee. From 1976 to the end of 1980, the trustees of the trust were Beverly Ann Miller and Otis W. Miller. As of January 1, 1981, William Miller, the son of petitioners, was elected a trustee and Otis W. Miller resigned as a trustee. For the years 1981 through October 1982, Beverly Ann Miller and William Miller were the trustees of the trust. Beverly Ann Miller resigned in October 1982 and Robert Miller, another son of petitioners, was elected a trustee. Petitioners' accountant, William Mertsching, was also elected a trustee. From October 1982 through the end of 1983, William and Robert Miller and William Mertsching were the trustees of the trust. On June 16, 1976, Beverly Ann Miller transferred by quitclaim *580 deed to Otis W. Miller her one-half interest in the building in which Otis W. Miller operated his medical practice, her interest in their home and the land on which the home was located (apparently including the land on which the farm was operated), and the furnishings and other personal property in their home. Otis W. Miller then transferred by warranty deed this real property to the trust and transferred to the trust the personal property in the home and his one-half interest in the personal property in the medical building, which was the equipment and office furnishings that were used in his medical practice. Although the record does not contain a specific transfer to OMFT of vehicles used in Dr. Miller's medical practice, the farm operation, or the vitamin sale business, or a transfer of the various items of equipment used in the farm operation, these items are shown on a depreciation schedule attached to the income tax return of OMFT for its fiscal year July 1, 1977, through June 30, 1978. OMFT filed fiduciary Federal income tax returns, Forms 1041, for fiscal years ending June 30, 1978 through 1983. On these returns, it reported distribution of any trust income shown to various *581 trust beneficiaries and, therefore, reported no taxable income. In June 1976, Otis W. Miller also executed a document entitled "General Affidavit" in which he stated that he was the grantor-creator of OMFT and on this date conveyed to this trust "certain of my real and personal properties and the right, title and interest therein, to form the Corpus of this Trust, included therein is the exclusive use of my lifetime services and all of the currently earned remuneration accruing therefrom." This document also purported to convey the lifetime services of Beverly Ann Miller "and all the currently earned remuneration accruing therefrom." In June 1976, petitioner as party of the first part, and OMFT, as party of the second part by Beverly Ann Miller, trustee, executed a document entitled "Agreement and Contract." This document recited that it was executed between Otis W. Miller, M.D. and OMFT for the purpose of establishing an independent contract relationship and contractual agreement between the parties. The document provided in part as follows: 1. That the Party of the Second Part will provide the kinds of services to the Party of the First Part which are incidental to, but do *582 not include, the practice of medicine at whatever place the business of the Party of the First Part is conducted, as follows: * * * 2. That, being hereby relieved of all responsibility of the business other than the actual practice of medicine, the Party of the First Part hereby agrees to compensate the Party of the Second Part of the total proceeds (gross income) which accrues from the business. 3. All equipment, tools, or supplies will be provided by the Party of the Second Part. 4. This contract shall run from day to day, or until the project Second Party is hired for, is completed, thereby making it impossible for the First Party to fire Second Party; both Parties are equally bound to this Contract; Second Party's pay may be received at any time upon reasonable demand for work or performance of the Contract up to the time of the demand; all of the amounts shall be paid in full with no deductions of any kind. One hundred units of beneficial interest were issued by the trust. On June 16, 1976, the entire 100 units were issued to Otis W. Miller, and on that same date he transferred 50 of those units to Beverly Ann Miller. Also on June 16, 1976, Beverly Ann Miller and *583 Otis W. Miller transferred their 50 units each to OMFT and OMFT on that same date transferred 33 units to Beverly Ann Miller, 12 units to William Miller, 10 units to Robert Miller, 15 units to Judy Miller, 15 units to Sue Miller, and 15 units to Jon Miller. Judy Miller, Sue Miller, and Jon Miller were children of petitioners. On June 17, 1976, 2 of the 12 units transferred to William Miller were transferred to Nicole Miller, a grandchild of petitioners. Mrs. Miller continued to hold the 33 units until July 3, 1978, when 5 of those units were transferred to Sue Miller. Mrs. Miller continued to hold the remaining 28 units until July 1, 1979, when they were transferred to her children, 1 to Judy Miller, 15 to Jon Miller, and 12 to Sue Miller. On December 26, 1980, the alleged trustees of OMFT petitioned for, and were later granted an order to amend and modify the original OMFT. This amendment provided, as had the original trust instrument, for a 25-year life for the trust with termination at an earlier date by the trustees and gave very broad powers to the trustees. It also provided for certificates of beneficial interest, but in the amendment there were Class A certificates that *584 consisted of rights to income and corpus, Class B certificates conferring only rights to income, and Class C certificates conferring only rights to corpus on a pro rata basis. No gift tax returns were filed by either petitioner for any of the transfers made to the trust. Dr. Miller did not comply with the agreement that 100 percent of his remuneration be paid to OMFT, and there is no showing to what extent any remuneration of Mrs. Miller was paid to OMFT. Initially, Dr. Miller transferred to OMFT 80 percent of his receipts from his medical practice and later transferred 75 percent. On February 1, 1980, Beverly Miller as grantor and Dr. Miller and Mrs. Miller, as the two trustees, executed a declaration of trust of "The B & O Leasing Trust" (B&O). This document provided the same broad powers for the trustees as the OMFT declaration and provided for 100 certificates of beneficial interest initially to be issued to the grantor. After its formation, B&O filed fiduciary income tax returns, Forms 1041, on which depreciation was claimed on various vehicles, some of which were used in connection with Dr. Miller's medical practice, the farm and the vitamin sale business. Dr. and Mrs. *585 Miller remained the trustees of this trust from its formation through the year 1983. Fiduciary income tax returns, Forms 1041, were filed for an entity entitled "Miller Nutrition Business Trust" (MNBT) for fiscal years ending August 31, 1978, through August 31, 1983, with a change to a calendar year in 1983. The 1983 return was for the year ended December 31, 1983. The return for the year August 1, 1977, through August 31, 1978, was filed on a 1978 form. Fiduciary income tax returns on Form 1041 were filed for an entity entitled "Miller Medical Trust" (MMT). These returns were filed for the calendar years 1981, 1982 and 1983. The trustee of MMT for all the years 1981 through 1983 was shown as Beverly Miller. Mrs. Miller did the bookkeeping and kept minutes for all of the "trusts" for all of the years here in issue, but received no compensation for rendering these services. Petitioners' son, William Miller, while he was a trustee of OMFT for 1981 through 1983, resided in Omaha, Nebraska. He had resided there at least since 1978. Omaha, Nebraska is 160 miles from Ord, Nebraska. William Miller had no professional expertise in the medical field. William A. Mertsching, listed *586 as trustee of OMFT from October 1982 through 1983, had an accounting practice located in Denver, Colorado, during this entire period of time. During the years here in issue, all of petitioners' children resided away from the family home in Ord, Nebraska. The two youngest children, a son and a daughter, were in college in Scottsbluff, Nebraska, and petitioners' son, Robert Miller, was with the F.B.I. in Washington, D.C. Dr. and Mrs. Miller continued to reside in the family home and use the furnishings of the home after the home and furnishings were transferred to OMFT. There is no indication in the record that they paid any rental for use of these properties to OMFT. Mrs. Miller made sales calls and deliveries of vitamin products for the vitamin business. Some of these sales were to patients of Dr. Miller. Neither Dr. Miller nor Mrs. Miller kept records of the mileage the Dodge van or any other automobiles they used were driven for business purposes or any logs showing places to which these vehicles were driven. The franchise for the vitamin business, which was a Shaklee franchise, was held by Dr. Miller individually. Shaklee required this franchise to be held by an individual. *587 Dr. Miller used and operated the equipment located in the medical building. In 1980, the association between petitioner and the doctor who had shared the building with him ceased and the doctor who had shared the building with Dr. Miller transferred by deed his one-half interest in the building to OMFT. After the signing of the Declaration of Trust of OMFT, Dr. Miller hired and supervised the employees in his medical practice. He made all decisions on the type of employees needed and the hours to be worked by the employees, as well as the hours he worked. He managed the medical clinic. He continued to practice medicine as he had before, without direction from the "Trustees" of OMFT. OMFT, B&O, MNBT and MMT each had a bank account. Both petitioners wrote checks on the MMT bank account and made book entries in the MMT check register. Receipts from Dr. Miller's medical practice were transferred to MMT and expenses of his medical practice deducted on its fiduciary income tax return. Trustee meetings of the "Trusts" did not occur on a regular basis, but generally were held informally when the children were at home. On their individual income tax returns for the years here *588 in issue, petitioners reported the receipts from the medical practice but deducted the 80 percent or 75 percent of the receipts they showed as transferred to OMFT or MMT. Petitioners also reported on their individual income tax returns certain trustee fees and distributions from OMFT or MMT. B&O reported certain income from leasing automobiles and claimed depreciation and other deductions in connection with the automobiles. The returns filed by OMFT for its fiscal years ended June 30, 1978, 1979 and 1980, reported as "contract income" receipts from Dr. Miller's medical practice. Receipts from the farming operation, and receipts from the vitamin business were also reported. Deductions were taken for expenses of the medical practice, the farm operations and the vitamin business, and depreciation deductions were taken with respect to the equipment in the medical practice and the farming operation, including automobiles. For later years, MNBT reported sales from the vitamin business, as well as farm receipts and expenses, and deducted the expenses claimed in connection with the vitamin business and farm operation. For the calendar years 1981, 1982 and 1983, MMT on its return showed *589 its business as a medical clinic and its product as medical office. It apparently reported 75 percent of Dr. Miller's gross receipts from his medical practice and deducted the expenses connected with that medical practice. OMFT, on its return for its fiscal years ended June 30, 1981 through 1983, continued to claim a deduction for depreciation on the medical building. Respondent in his notice of deficiency to petitioners determined that the four trusts were shams and included the income reported by these trusts in petitioners' income. He allowed the deductions claimed by these trusts with some adjustments as deductions for petitioners. The parties have now, by agreement, disposed of all issues with respect to the amount of deductions, except depreciation with respect to automobiles used in the various businesses. In the notice of deficiency respondent allowed, in each year, automobile expenses which are not here in issue and allowed depreciation for business automobiles of $ 3,164.78, in each of the years 1978, 1979 and 1980, $ 550 of depreciation in 1981 and 1982, and $ 1,774 in 1983. [2] Respondent determined that part of the deficiency in each of the years here in issue was *590 due to negligence or intentional disregard of rules and regulations within the meaning of sections 6653(a) and (a)(1), and for each of the years 1981, 1982 and 1983 determined that the entire deficiency was due to negligence so that there was an addition to tax under section 6653(a)(2) on the entire deficiency, and for 1982 and 1983 determined that the deficiency was due to a substantial understatement within the meaning of section 6661. OPINION Petitioners argue in this case that the trusts they formed were legal trusts under the laws of Nebraska and therefore should be recognized for income tax purposes, since there is nothing illegal about transferring *591 property to a trust and leasing it back. Petitioners then argue that the rental paid to OMFT was a fair rental for the building and equipment. Petitioners further argue that the various automobiles used for business were used exclusively for business and therefore they should be entitled to depreciation on 100 percent of the value of those automobiles. Respondent takes the position that the various alleged trusts created by petitioners should not be recognized for income tax purposes. Respondent assigns four different reasons for his contention. Respondent contends that the trusts, as created, and the transfers of petitioners' services and properties to the trusts are sham transactions totally without substance for income tax purposes. Respondent further states that Dr. Miller's attempted transfer of his medical services to the trusts violates assignment of income principles. He further states that the income, deductions, and credits claimed by the trust should be reallocated to petitioners pursuant to section 482 and that the grantor trust provisions of section 671 through 677 require that petitioners be taxed on the trust income. Respondent contends that petitioners failed *592 to show any error in the deduction for depreciation allowed on their business vehicles and that petitioners have not shown error in respondent's adjustment with respect to their KEOGH plan contribution deductions. Respondent further contends that petitioners have failed to show error in his determination of additions to tax in the notice of deficiency. We agree with respondent's contention that the trusts created by petitioners had no economic reality and therefore should not be recognized for income tax purposes. As we pointed out in Markosian v. Commissioner,73 T.C. 1235, 1241 (1980), it is well recognized that a taxpayer has a legal right to reduce or avoid taxes by any means permitted by law. However, this does not include the right to create a paper entity to avoid taxes when that entity has no economic reality. Petitioners argue that the trusts they created were valid under Nebraska law. In our view, the validity of the trusts under Nebraska law is very questionable in light of the decision in First National Bank in Ord v. J. H. Schroeder and J. H. Schroeder Family Trust,222 Neb. 330, 383 N.W. 2nd 755 (1986). *593 In the Schroeder case, the Nebraska Supreme Court held that no trust is created unless there is a beneficiary who is definitely ascertained at the creation of the trust or within the period of the rule against perpetuity. The court in the Schroeder case, in holding that the J. H. Schroeder Family Trust was invalid, cited language in the trust with respect to certificates of beneficial interest identical to the language in the OMFT here involved. However, we need not decide this case on the validity of the various trusts under Nebraska law. As we pointed out in Markosian v. Commissioner, supra at 1242, even if a trust is valid in form, it is not valid unless it is administered as a trust. Here, as in the Markosian case, the facts show that OMFT and the other purported trusts were not administered as trusts. Dr. Miller purportedly conveyed his lifetime services and all his earned remunerations from these services to OMFT, but in fact he received all of the fees from *594 his medical practice and initially paid 80 percent, and later 75 percent of these receipts over to the trust. Likewise, here as in Markosian, the evidence shows that neither petitioner gave any recognition to any fiduciary responsibilities they should have had in dealing with the trust. The clear indication from the record as a whole is that, even after two of petitioners' children became the trustees, Dr. Miller, with the assistance of Mrs. Miller, continued to handle all the properties and businesses that were supposedly transferred to the trust in the same manner they had handled them prior to the transfer. The record shows that Dr. and Mrs. Miller continued to use the house transferred to the trust as their home and its furnishings, which were also transferred to the trust. There is no indication that they paid any rental to the trust for the use of the house and furnishings. The record shows no efforts on the part of the trustees, to collect 100 percent of Dr. Miller's medical receipts from him. Nor does it show how the operation of the vitamin business and the farm were carried on. The record shows that Dr. Miller continued to hold the franchise for the vitamin business *595 and Mrs. Miller continued to make most sales and deliveries without reference to any direction from the trustees of any of the trusts. Nothing in the record shows how any salaries or fees that may have been paid for management of the trusts were determined. The record does show that no salary was paid to Mrs. Miller by the trusts for her services in doing the bookkeeping, writing the checks, and keeping the bank accounts of the trusts. In substance, here as in Markosian v. Commissioner, supra, the record shows that the relationship of petitioners, the grantors of the trust, to the various properties transferred to the trust did not differ before and after the trust was created. Petitioners conducted their business and lived exactly as they had before the transfer of the property. Dr. Miller used the same building and equipment for his medical practice that he had used before it was transferred to the trust and, as previously stated, petitioners lived in the home and used the furnishings transferred to the trust. Petitioners argue that the trust made payments for expenses of Dr. Miller's medical practice and certain other expenses. However, the expenses paid *596 for that medical practice came from the funds produced by that practice and not from any independent funds that otherwise had been transferred to the trust. It is clear here that, regardless of who the trustees were, petitioners in effect had powers to deal with the trust property as their own. The children of petitioners who were named trustees were not at home and the record is clear they had no real participation in management of the medical business, the vitamin business, or the farm business. The fact that petitioners dealt with the trust property as their own is clearly shown by the shifting of property purportedly irrevocably transferred to OMFT to three other alleged trusts. The record here also shows no purpose other than tax avoidance for the creation of these trusts. Dr. Miller claimed that the trust was created to help with his malpractice insurance and as an estate planning device. However the record shows that Dr. Miller was personally responsible for any malpractice even after creation of the trust. He testified with respect to a suit brought against him which had gone to the Supreme Court of Nebraska, apparently with no question that Dr. Miller personally was *597 the proper person to sue. Likewise, petitioners have totally failed to show any estate planning value in the way these trusts were set up. In Wesenberg v. Commissioner,69 T.C. 1005 (1978), and in Markosian v. Commissioner, supra, the printed documents used to form the so-called trusts were identical to those used in this case. In each of these cases, we held that the grantor had made an attempt to assign his income to the trust and held the income taxable to the grantor of the trust under the assignment of income doctrine. Here, just as in the Wesenberg case, Dr. Miller, who was, of necessity, responsible for earning the income from his medical practice since the trust was not in a position to practice medicine, had no attributes of an employee of the trust. He conducted his medical practice on an independent basis as he had before the trust was created. On paper, he attempted to assign all of his income to the trust, but in practice only attempted to assign 80 percent and 75 percent. However, even to the extent of this attempted assignment, there was an invalid assignment of income, just as in the Wesenberg case. In Vnuk v. Commissioner,621 F.2d 1318 (8th Cir. 1980), *598 the Circuit Court held, affg. a Memorandum Opinion of this Court, that Dr. Vnuk had merely attempted to assign his income from his medical practice to a trust and, therefore, the transaction should not be recognized. From the facts recited in the Vnuk case, it is apparent that papers similar, if not identical to those used in this case, were used to create the alleged trust. There, as here, an assignment was made of real and personal property and lifetime services by the grantor. The trust there, as here, was for a period of 25 years, but could be terminated sooner by the trustees, and the trust had certificates of beneficial interest, just as the trust here. There, as here, the taxpayer had executed a document purporting to transfer real property and personal property to the trust and had executed an affidavit stating that he had transferred to the trust the exclusive use of his lifetime services and all currently earned remuneration accruing therefrom. It is reasonably clear that the documents used in the Vnuk case were documents obtained from ESP just as were the documents used in the instant case and in the Markosian and Wesenberg cases. In the Vnuk case, *599 the Court pointed to the well-established principle that income is taxed to the person who earns it and that an attempt to avoid taxation through shifting income away from the true earner to another entity does not shift the incident of taxation. The trust forms, which petitioners used in this case, have been the subject of numerous cases in this and other courts. See for instance Duncan v. Commissioner,756 F.2d 747 (9th Cir. 1985), affg. per curiam a Memorandum Opinion of this Court [3]; Vercio v. Commissioner,73 T.C. 1246 (1980); Edwards Family Trust v. United States,572 F. Supp. 22 (D. N.M. 1983). Some of the numerous cases involving the preprinted trust documents sold to various individuals by ESP held the trust invalid, as we do here, on the grounds that the trusts were shams not administered as trusts, but merely a poorly vailed attempt to split the income of the grantor. Others have held that the attempt to assign an individual's earnings to a trust violated the assignment of income doctrine, and still others have held that the income was taxable to the grantor of the trust under sections 671 to 677. Having concluded *600 here that the trusts were shams and merely an attempt by the Millers to split their income among sham entities, we need not discuss in detail whether the trust income would be taxable to the Millers under the assignment of income doctrine or under the sections of the Code dealing with taxability of trust income to the grantors. We conclude that respondent correctly ignored the trusts and taxed the income earned by the Millers to them as their income in each of the years here in issue. There is very little information in this record dealing with the amount of depreciation properly allowable on the various automobiles used by petitioners in their business. The only information in the record, other than a statement that an LTD on which depreciation was claimed on certain of the fiduciary 1041 returns was in fact a personal *601 family car and a reference to a truck used on the farm, is the testimony of the use by Dr. Miller of a Dodge van. The record shows that Dr. Miller drove the van from his home to his office each day. Presumably, he also drove it back, from wherever he concluded his day's work, to his home. Clearly, this driving of the Dodge van was personal commuting driving. Dr. Miller's testimony was that the van was used entirely for business. He stated that he took trips in it to attend seminars and that he used it for hospital and house calls. The record, however, is devoid of any evidence as to the total mileage driven by the van, of any estimate of how much of this would have been commuting, and of the exact nature and purpose of the trips that Dr. Miller took in the van when he says he was attending seminars. Because of this lack of evidence, this Court is unable to determine the business purpose of such trips. There is also nothing to show the amount of driving Dr. Miller did to the hospitals and for home calls on patients. Because of the lack of evidence in the record which shows any error in respondent's determination of depreciation of the Dodge van, we sustain respondent's determination. *602 In fact, the Court has found nothing in the record to show the cost of the van, nor has either party called our attention to any such evidence. Also, there is no evidence in the record to show a breakdown of the depreciation allowed by respondent in the notice of deficiency. We sustain respondent's determination with respect to the depreciation on petitioners' business automobiles because of petitioners' failure to carry their burden of showing error therein. In addition, petitioners have not produced any evidence to show error in respondent's adjustment in the notice of deficiency with respect to their KEOGH plan. Petitioners, likewise, have failed to show error in respondent's determination of additions to tax under sections 6653(a), 6653(a)(1), 6653(a)(2) and section 6661. In our view, it was clearly negligent and in total disregard of the rules and regulations for petitioners to attempt to split income among several sham entities. A clear indication that petitioners did not, in any way, respect the format of the OMFT trust they claimed to have created, is the fact that, although this trust was to be irrevocable and property and services were to be transferred to it, petitioners, *603 after its creation, reported income as if they had created three other trusts to which the same services and property were purportedly transferred. Such a blatent attempt to split income is clearly negligent. Petitioners have made no showing of error, or, for that matter, specifically contested respondent's determination of an addition to tax under 6661 for substantial understatement of income. We, therefore, sustain respondent's determination of additions to tax under sections 6653(a), 6653(a)(1), 6653(a)(2) and section 6661. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years here in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. * 50% of the interest due on $ 13,397.00 ** 50% of the interest due on $ 12,185.00 *** 50% of the interest due on $ 7,133.00↩
2. Respondent in his arguments states that the depreciation allowed consisted of 100 percent of allowable depreciation on a 1974 Dodge and 100 percent of allowable depreciation on a 1980 Dodge Royal and 50 percent depreciation on a Dodge van with depreciation being on a straight-line basis over three years. Although most of the testimony concerned the Dodge van, the record does not show the cost of the van, whether or not respondent is correct that it was depreciated over three years, and what percent of depreciation was allowed.↩
3. See also Sechauer v. Commissioner,T.C. Memo. 1987-237, Chief v. Commissioner, T.C. Memo. 1987-84, and numerous other Memorandum Opinions of this Court in which Markosian v. Commissioner,73 T.C. 1235 (1980), and Vnuk v. Commissioner,621 F.2d 1318↩ (8th Cir. 1980), have been cited.