No. 99-532

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 166

300 Mont. 297

3 P.3d 654

RUBY MOUNTAIN TRUST, and

VIRGIL and LOUISE BATES,

Petitioners and Appellants,

v.

THE DEPARTMENT OF REVENUE

OF THE STATE OF MONTANA, and

THE STATE TAX APPEAL BOARD

OF THE STATE OF MONTANA,

Respondents and Respondents.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Dana C. Christian, Livingston, Montana

For Respondents:

Roberta Cross Guns, Tax Counsel, Helena, Montana

Submitted on Briefs: January 13, 2000

Decided: June 22, 2000

Filed:

_____

ClerkJustice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1 In this appeal by Virgil and Louise Bates (the Bates) and the Ruby Mountain Trust (the Trust), we are asked to decide whether the District Court of the First Judicial District, Lewis and Clark County, correctly affirmed the decision of the State Tax Appeal Board (STAB) finding that the Trust did not qualify for treatment as a trust for tax purposes. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 The facts of this case are not in dispute. The Bates owned a 500-plus-acre family farm in Manhattan, Montana, that they transferred along with various buildings, livestock, and personal property to the Trust upon its creation on December 29, 1992. The Trust was created and structured according to a trust establishment "kit" that the Bates had previously purchased for $2,400 after attending a "financial planning" seminar in Billings.

¶3 Upon transfer of the Bates' property, the Trust issued 100 certificates of beneficial interest to the Bates and their three children. The Bates received a two percent interest in the Trust, while the remaining ninety-eight percent interest was given to their children.

The named "beneficiaries" of the Trust are the Bates' children. The trustees are Gary and Joyce Thompson, neighbors of the Bates, and Val Bentley, who resides outside of Montana. The Bates themselves are characterized as "co-managers" of the Trust.

¶4 Though the Trust is captioned "irrevocable," the trustees may terminate the Trust at any time provided that all of the holders of the units of beneficial interest agree. The Trust contains no distribution clause, however. Virgil testified that the certificates of beneficial interest proportionally represent, for purposes of distribution "[w]hatever the property's worth." If the Trust were terminated, the corpus presumably would be distributed on a pro-rata basis according to the certificates of beneficial interest issued to the Bates and their children.

¶5 Following its creation, the Trust hired Virgil in the position of "caretaker." Under the terms of the caretaker's agreement, the Trust pays him $20 an hour for his farming and management services. Additionally, the Bates are authorized as co-managers of the Trust to write checks against the Trust's account up to $5,000 (excepting general trust operating expenses) without prior approval of the trustees. The Bates have also entered into a lease and rental agreement with the Trust, under which they lease farming equipment to the Trust and pay rent for continuing to reside in the farmhouse on the property. Further, the Trust has been paying the Bates' debt obligations with respect to the farm.

¶6 Much of the Bates' farm property that was transferred into the Trust was surveyed and subdivided into twenty-two plots of twenty-one acres each, leaving about sixty acres of undeveloped farmland. The Bates hired an independent appraiser to value the property, who calculated that with the addition of various improvements making the lots suitable for residential sale, the land transferred to the Trust had a fair market value of $1,420,000. The improved and developed lots were prepared for sale, advertised for sale, and ultimately sold by the Bates. The sales of these subdivided and developed parcels have generated income in excess of $1 million for the Trust.

¶7 The Bates did not pay a gift tax when they put the farm in trust. They claimed that since the transfer was in exchange for units of beneficial interest, it was not a gift. Nor did the Bates pay any self-employment taxes. Furthermore, when the Bates transferred the land into the Trust, they adopted the fair market value of the subdivided land as its basis. Of the total proceeds the Trust received for sale of the developed parcels, the Bates claimed that only $5,000 per beneficiary had been distributed while the remainder of the proceeds had been reinvested in the corpus of the Trust by means of improvements thereto. The Bates

thus asserted that income from the sales of the lots was not taxable until such time as the proceeds were actually paid over to the beneficiaries.

¶8 In 1996, in conjunction with a nationwide investigation by the Internal Revenue Service (IRS) to identify legally questionable trust arrangements, the DOR undertook an audit of the Trust. Two primary income-generating activities were determined by the DOR to fall within the Trust: (1) farming and (2) the subdivision/selling of land. Specifically, the DOR identified a number of concerns in connection with the land-development activities of the Trust, including, among others, the issuance of certificates of beneficial interest to the Bates in exchange for the land, the degree of control retained by the Bates over the corpus of the Trust, and the Bates' transfer of the property into the Trust at a "stepped-up" basis (i.e., the Bates' fair market value appraisal conducted after the subdivision improvements).

¶9 In particular, the DOR took issue with the Bates' claim of fair market value basis, asserting that the Bates were attempting to impermissibly avoid capital gains and other taxes by valuing the land transferred to the Trust at a stepped-up basis when it should have been valued at the Bates' carry-over "book value" (i.e., the historical cost of the farmland to the Bates prior to the value-added subdivision improvements). Ultimately, the DOR issued an audit assessment to the Bates regarding the Trust for the tax years 1993 and 1994, disallowing the Trust for tax purposes and imputing any "business income" and expenses derived from the Trust to the Bates' individual tax returns.

¶10 The Bates and the Trust appealed the DOR's assessment in a timely manner. In April of 1997, a hearing was held before a DOR Administrative Hearing Examiner. The Bates argued that the Trust was not void for Montana tax purposes, and that the Bates should not be held personally liable for capital gains or other taxes on the income generated by the sale of the subdivision lots. The hearing examiner issued his decision on June 11, 1997, finding the Trust and the property transfer to the Trust void, and holding the Bates liable as individuals for the income and expenses associated with the sale of the developed parcels.

¶11 The Bates and the Trust then filed an objection to the hearing examiner's decision, and the DOR's Director reviewed the matter on briefs. A Final Agency Decision was issued on April 20, 1998, affirming the hearing examiner's findings of fact, conclusions of law, and order. The Bates and the Trust timely appealed to STAB. Another hearing was held, and STAB issued its decision on November 19, 1998, again voiding the Trust for tax purposes

and making the Bates individually liable for taxes on the income generated from the sale of their land. Subsequently, the Bates and the Trust separately filed petitions for judicial review, which were consolidated in the stipulated venue of the District Court. The court issued its decision affirming STAB on June 9, 1999. The Bates and the Trust appeal.

## DISCUSSION

¶ 12 Did the District Court correctly affirm STAB's decision that the Trust was legally invalid and that the Bates therefore personally owe Montana taxes?

¶13 We review STAB's decision in the same manner as the District Court. *See* § 2-4-704, MCA. Since the material facts of this case are not in dispute, the only disagreement between the parties is the legal question of the validity of the Trust. In reviewing questions of law, we simply ascertain whether the agency's interpretation of the law is correct. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474, 803 P.2d 601, 603.

¶14 The parties do not dispute that upon its creation, the Trust issued certificates of beneficial interest (also referred to as "units of beneficial interest" or "UBIs") to the Bates and their children in exchange for the land and assets the Bates transferred to the Trust. Rather, the parties disagree as to the effect that the issuance of UBIs has on the validity of the Trust for tax purposes. The parties agree, however, that resolution of the trust-creation issue will resolve the tax issue. Thus, if the Trust is legally invalid, the Bates individually owe Montana capital gains and other taxes for the disputed tax years 1993 and 1994.

¶15 The Bates contend that they have complied with all legal formalities and that the Trust, being "personal" and "irrevocable" in nature, is a legitimate estate-planning vehicle which should be respected for tax purposes. Particularly, they assert that the Trust is not a legally invalid "business trust" simply because it operates a legitimate business endeavor while minimizing tax and personal liability. The DOR counters that there are several factors making the Trust an "abusive trust" under Montana and federal law. As such a "sham" entity, the DOR argues that the Trust should be disregarded for tax purposes and that any income derived from trust activities should be imputed to the individual tax returns of the Bates. We agree. Under the following analysis, we hold that the Trust does not qualify for treatment as a trust under Montana and federal law, and, therefore, that the Bates are personally liable for Montana taxes for the years in question.

¶16 The crux of this case is the application of § 72-33-108(4), MCA, which defines what

constitutes a legitimate "trust" under Montana law. In pertinent part, the statutory definition provides that a trust does not include "business trusts providing for <u>certificates to be issued to beneficiaries</u> . . . ." Section 72-33-108(4), MCA (emphasis added). As the DOR principally contends, the issuance of certificates of beneficial interest or UBIs by the Trust is analogous to the issuance of stocks or shares by a corporation, thus taking such a "business trust" out from under the provisions of Title 72 of the Montana Code applicable to ordinary trusts. *See also* § 35-5-101, MCA (defining a "business trust" under Title 35 of the Montana Code applicable to corporations, partnerships, and associations).

¶17 The Bates cite legislative history applicable to § 72-33-108(4), MCA, arguing that the exclusionary definition of a "business trust" is meant to apply only to "big business" and not a "family irrevocable trust." However, we agree with the DOR that the legislative history cited by the Bates, though not particularly illuminating, supports the rather straightforward proposition that an entity with objective indicia of a business organization (i.e., a partnership or corporation) is not to be regarded as a trust under Montana law.

¶18 Similarly, federal law refuses to recognize the validity of a business trust for tax purposes. In contrast to an ordinary trust, business trusts

> are not simply arrangements to protect or conserve the property for the beneficiaries. These trusts . . . generally are created by the beneficiaries simply as a device to carry on a profit-making business which normally would have been carried on through business organizations that are classified as corporations or partnerships under the Internal Revenue Code.

26 C.F.R. § 301.7701-4(b).

¶19 As the DOR indicates, federal law considers a business trust to be an "abusive trust." The IRS recently issued Notice 97-24, warning state and federal agencies and taxpayers of the existence and promotion of certain types of "abusive trust arrangements" that allege to reduce or eliminate federal taxes. According to the Notice, these trust arrangements are abusive of the law and are not to be recognized as ordinary trusts. They are abusive in that they promise "tax benefits with no meaningful change in the taxpayer's control over or benefit from the taxpayer's income or assets." Such an abusive trust arrangement often promises, *inter alia*, "reduction or elimination of income subject to tax; . . . a stepped-up basis for property transferred to the trust; the reduction or elimination of self-employment taxes; and the reduction or elimination of gift and estate taxes."

¶20 One example of an abusive trust is a business trust, which is described in the Notice as an arrangement where, as here, property (usually a business) is transferred to the trust in exchange for units or certificates of beneficial interest. *See, e.g.*, Markosian v. Commissioner of Internal Revenue (T.C. 1980), 73 T.C. 1235 (dentistry practice). Payments to holders of the UBIs, often characterized as "deductible distributions," are claimed to largely reduce or eliminate the taxable income of the business trust. Additionally, there is claimed to be little or no income from self-employment on the theory that the taxpayer allegedly receives little to no income from the trustees' management of the business property.

¶21 In Morrissey v. Commissioner of Internal Revenue (1935), 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263, the United States Supreme Court set forth the distinguishing characteristics of a business association or trust, as opposed to an ordinary trust. Analogous to this case, a considerable portion of the trust property at issue in *Morrissey* had been surveyed and subdivided into lots, and various residential improvements were made to the subdivided property to facilitate sales of the lots. *See Morrissey*, 296 U.S. at 360-61, 56 S.Ct. at 296, 80 L.Ed. at 272.

*¶22 Morrissey instructs that this Court must look to the substance of the trust arrangement, not its form, in determining whether the entity constitutes an impermissible business trust or a legitimate ordinary trust. Thus, "the absence of particular [corporate] forms, or of the usual terminology of corporations, cannot be regarded as decisive." Morrissey, 296 U.S. at 358, 56 S.Ct. at 295, 80 L.Ed. at 271. Rather, we look to whether the economic realities of the trust arrangement indicate that it is, in substance, "a medium for the carrying on of a business enterprise and sharing its gains," thus making it analogous to a corporate organization. Morrissey, 296 U.S. at 359, 56 S.Ct. at 296, 80 L. Ed. at 271.*

¶23 Hence, although a business trust may not have "directors" or "officers," as in a corporate organization, the "trustees" may function in nearly the same manner as directors of a corporation for purposes of carrying on the business enterprise at issue. *Morrissey*, 296 U.S. at 358, 56 S.Ct. at 295, 80 L.Ed. at 272. Additionally, the earmarks of a business trust, not usually found in an ordinary trust, include the following characteristics: centralized management, continuity of life, transferability of interests, and limited personal liability. *See Morrissey*, 296 U.S. at 359, 56 S.Ct. at 296, 80 L.Ed. at 272. Ultimately, in a business trust, the relationship of the grantor to the property transferred does not differ in any material aspect before and after the creation of the trust. *Markosian*,

73 T.C. at 1243.

¶24 We concur with the DOR that the distinguishing features of a business trust are manifest in the Trust. First, the Bates' transfer of property to the Trust was done in exchange for certificates of beneficial interest that are factually identical to shares or stocks issued by a business entity, particularly for purposes of identifying rights to distributable income. Thus, the UBIs held by the Bates effectively make them, along with their three children, "shareholders" in the Trust.

¶25 Second, these units of beneficial interest are easily transferred. The terms of the Trust require only the consent of one other disinterested beneficiary to effect such a transfer. Hence, similar to shares or stocks in a business entity, the UBIs are readily transferable.

¶26 Third, and importantly, the Bates continue to exercise substantial managerial discretion over the corpus of the Trust. The role of the "trustees" is somewhat vague, although they appear to function largely as an advisory board to the Bates, much like the directors of a business entity. Although the Bates point to the trust documents as indicating that the trustees have penultimate managerial authority over the business property, there is substantial evidence that the Bates made nearly all of the decisions relevant to the management of the property in the Trust, including both land-development and farming activities, and that the trustees simply "rubber-stamped" the Bates' managerial decisions. Moreover, the Bates have the authority to write substantial checks against the Trust's account without prior approval from the trustees. While the Bates pay nominal rent for continuing to reside in the farmhouse, there is no indication that they pay rent to the Trust for their continued use of the non-subdivided farmland. The weight of the evidence suggests that there has been little to no change in the Bates' relationship to the assets they transferred into the Trust, and that the Bates' business affairs have been conducted in substantially the same manner as prior to execution of the trust documents in 1992. In other words, "regardless of regularity of form as a matter of plutological reality, there [has been] no substantial change in economic ownership" here. Burde v. Commissioner of Internal Revenue (2d Cir. 1965), 352 F.2d 995, 1001.

¶27 Fourth, the Trust has a continuity of life more typical of a business entity. Trustees can be any person, provided that not more than 50% of the trustees are related to the Bates. Trustees can be replaced in a variety of ways akin to the directors of a corporation, including death, resignation, removal for cause, and the addition of another trustee. Furthermore, the Bates may personally appoint a "Protector" who can independently

remove for cause and replace a trustee without unanimous consent of the other trustees.

¶28 Fifth, there is no personal liability for trust debts adhering to the Bates. Rather, all debt liability lies with the Trust property.

¶29 Lastly, as highlighted in IRS Notice 97-24, the Trust exhibits several of the distinguishing characteristics of an "abusive" business trust under federal law. Most important among these characteristics, the Bates accepted certificates of beneficial interest or UBIs in exchange for transferring their property into the Trust, and the property was transferred into the Trust at a stepped-up basis.

¶30 The Bates are correct in arguing that a taxpayer has a legal right to minimize or entirely avoid taxes by any means permitted by the law. *See* Gregory v. Helvering (1935), 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 599. However, when the form of the transaction has not, in fact, altered any cognizable economic relationships, that form will be disregarded and the tax law applied according to the substance of the transaction. *Markosian*, 73 T.C. at 1241 (citing Furman v. Commissioner of Internal Revenue (T.C. 1966), 45 T.C. 360). While we acknowledge that the Trust has some formal characteristics of an ordinary trust, we determine, on balance, that it is substantially a medium for the carrying on of the Bates' farming and land-development enterprises; there has been little material change in economic ownership or reality before and after creation of the Trust.

¶31 Montana law does not recognize a "business trust" where, as here, certificates of beneficial ownership are issued to beneficiaries. Section 72-33-108(4), MCA. Therefore, since the Trust is void under Montana law, any transfer of property to the Trust is likewise void. The Trust must be disregarded for Montana tax purposes. We hold that the District Court correctly affirmed STAB's order affirming the DOR's assessment against the Bates personally.

¶32 Affirmed.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

/S/ JAMES C. NELSON